**SHAWNEE TRAIL CONSERVANCY, Blueribbon Coalition, Illinois Trail Riders, Illinois Federation of Outdoor Resources, Plaintiffs,**

v.

**Hurston A. NICHOLAS, in his official capacity as Forest Supervisor, Shawnee National Forest, United States Forest Service, an administrative agency within the U.S. Department of Agriculture, Defendants,**

**and**

**Sierra Club and Regional Association of Concerned Environmentalists, Defendant–Intervenors.**

**No. 02–CV–4065–JPG.**

United States District Court, S.D. Illinois.

June 30, 2004.

Paul A. Turcke, Moore Smith Buxton, et al., Boise, ID, for Plaintiffs.

William E. Coonan, Assistant U.S. Attorney, Fairview Heights, IL, Thomas C. Buchele, Pittsburgh, PA, for Defendants.

## MEMORANDUM AND ORDER

GILBERT, District Judge.

Pending before the Court are cross-motions for summary judgment filed by the plaintiffs (Doc. 18), the defendants[1] (Doc. 23), and the defendant-intervenors (Doc. 21). Each party has also filed a response to the opposing side's motion (Docs. 29, 32 & 33) and a supplemental brief as requested by the Court (Docs. 41, 42 & 43). The plaintiffs have sought judicial review of agency action (or inaction, as the case may be) pursuant to provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701–706, raising issues under the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, *et seq.*, the National

---

1. Pursuant to Federal Rule of Civil Procedure 25(d), Forest Supervisor Hurston A. Nicholas has been substituted for former Forest Supervisor Forrest L. Starkey as a defendant in this case.

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331, *et seq.*, and the National Forest Roads and Trails Act ("NFRTA"), 16 U.S.C. § 532, *et seq.*

## I. Background

The plaintiffs filed this action to challenge the response of Forest Supervisor Hurston A. Nicholas, the United States Forest Service, an agency of the Department of Agriculture, and the Shawnee National Forest ("Shawnee") (collectively, "the Forest Service") to one of this Court's orders, to NFMA's travel planning requirements, to the agency's plan for the Shawnee, and to the NFRTA's trail maintenance requirements. Before delving into the plaintiffs' specific complaints, a bit of background is in order.

### A. *Forest Planning Authority*

Congress provided for the creation of national forests through the Creative Act of 1891, which gave the President authority to "set apart and reserve ... public lands wholly or in part covered with timber or undergrowth ... as public reservations." Charles F. Wilkinson & H. Michael Anderson, *Land and Resource Planning in the National Forests*, 64 Or. L.Rev. 1, 17–18 (1985) (quoting Act of Mar. 3, 891, ch. 561, 26 Stat. 1095, 1103, *repealed by* 90 Stat. 2792 (1976)). Through the Organic Administration Act of 1897, Act of June 4, 1897, ch. 2, 30 Stat. 34 (codified as 16 U.S.C. §§ 473–482, 551), and the Multiple–Use Sustained–Yield Act of 1960 ("MUSYA"), Pub.L. No. 86–517, 74 Stat. 215 (1960) (codified as 16 U.S.C. §§ 528–531), Congress established the purposes for which national forests are to be administered: the multiple use and sustained yield of the products and services in the forest, including outdoor recreation, range, timber, watershed, and wildlife and fish purposes. *See* 16 U.S.C.

§ 475; 16 U.S.C. § 528. To facilitate forest management for these purposes, Congress passed the Forest and Rangeland Renewable Resources Planning Act of 1974, Pub.L. No. 93–378, 88 Stat. 476 (1974) (codified as 16 U.S.C. §§ 1600–1614), which included a provision requiring the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System ...." 16 U.S.C. § 1604(a). This general directive was expanded in 1976 by the NFMA, Pub.L. No. 94–588, 90 Stat. 2949 (1976) (codified as 16 U.S.C. §§ 1600–1614), which required the Secretary to promulgate regulations for the development of forest plans that conformed not only to the MUSYA but also to the more detailed procedural and substantive guidelines set forth in the NFMA itself. 16 U.S.C. § 1604.

### B. *Planning in the Shawnee*

In 1992, the Forest Service adopted one of these land management plans for the Shawnee, the Amended Land and Resource Management Plan ("1992 Plan"). The 1992 Plan had as one of its many goals the designation at the program level of 286 miles of trails for all-terrain vehicles and off-highway motorcycles ("ATV/OHM") and 338 miles of equestrian/hiker trails. The 1992 Plan was programmatic in nature in that it discussed effects of the overall management of the Shawnee rather than site-specific effects of implementing any specific project at a particular location. The 1992 Plan was created as a result of objections to the original Land and Resource Management Plan that was approved for the Shawnee in 1986 ("1986 Plan"). In an attempt to resolve administrative appeals that had been filed against the 1986 Plan, the Forest Service entered

into a settlement agreement with the organizations that had filed the appeals.[2]

### C. Sierra Club Litigation

The settlement agreement, however, did not end the controversy. In April 1994, the Sierra Club and the Regional Association of Concerned Environmentalists ("RACE"), the defendant-intervenors in this case, filed a suit before this Court challenging various aspects of the 1992 Plan, including the 1992 Plan's provision designating corridors in which ATV/OHM trails on the Shawnee might ultimately be located.[3]

In an order entered September 25, 1995, the Court found several parts of the 1992 Plan and its supporting environmental impact statement ("EIS") lacking, including the ATV/OHM analysis. *See Sierra Club v. United States Dep't of Ag.,* Case No. 94–cv–4061–JPG, Mem. & Order (S.D.Ill. Sept. 25, 1995), *aff'd,* 116 F.3d 1482, 1997 WL 295308 (7th Cir. May 28, 1997) (Table). The Court found that the Forest Service had failed to support its statement in the EIS that other federal agencies that had authorized ATV/OHM use had had few problems with use outside authorized areas or criminal activity associated with ATV/OHM use. *Id.* at 50–51. Specifically, the Court pointed to contrary evidence in the record that the Land Between the Lakes National Recreation Area had experienced serious problems with ATV/OHM users. *Id.* at 51. The Court was particularly troubled in light of the Forest Service's historic difficulties with enforcing ATV/OHM prohibitions on the Shawnee and the lack of any attempt in the Forest

Service's EIS to identify specific enforcement efforts to restrict ATV/OHM use to designated trails or to analyze the impact of noncompliance with such restrictions. *Id.* at 51–53. In addition, the Court found that the Forest Service had failed to properly evaluate the cumulative effects of ATV/OHM use in combination with other uses proposed in the 1992 Plan. *Id.* at 21–22. The Court concluded that the EIS in support of the 1992 Plan's ATV/OHM provision was insufficient under NEPA and, accordingly, remanded the EIS to the Forest Service for further consideration. *Id.* at 53. It placed no time restrictions on when the further consideration could or should take place.

Pending such further consideration, the Court entered a permanent injunction stating, in pertinent part:

> The Forest Service shall not issue any decision notices or implement any decision involving the construction, maintenance, or designation of any trails for the use of all terrain vehicles and/or off-highway motorcycles ("ATV/OHM") in the Shawnee National Forest, nor shall the Forest Service issue any order or decision notice authorizing or permitting the use of ATV/OHMs in the Shawnee National Forest, except by federal or state personnel for administrative or emergency purposes. Consistent with this prohibition, the Forest Service shall not issue any decision notices or implement any decision on the Cadiz ATV/OHM Travelway, or any other ATV/OHM travelways. However, this injunction does not prevent the authorized use

---

**2.** The specific provisions of the 1992 Plan that are relevant to this action will be discussed as they are encountered in this order.

**3.** Such vehicles also fall into the category of "off-road vehicles" or "ORVs." *See, generally,* 36 C.F.R. § 295. For the purposes of this

order, the distinctions between ATVs, OHVs and ORVs is not significant. For consistency's sake, as in its September 25, 1995, order, the Court will continue to refer to these types of vehicles simply as ATV/OHMs.

of ATV/OHMs by people with disabilities.

*Sierra Club v. United States Dep't of Ag.*, Case No. 94–cv–4061–JPG, Perm. Inj. (S.D.Ill. Mar. 20, 1996). The injunction was effective "until such time as the Forest Service issues new or revised planning documents in a manner consistent with this Court's ruling." *Id.* at 4.

The Department of Agriculture appealed the Court's rulings, and in May 1997 the Seventh Circuit Court of Appeals affirmed the Court's decisions, including the injunction prohibiting the construction, maintenance or designation of any ATV/OHM trails on the Shawnee. *Sierra Club v. United States Dep't of Ag.*, 116 F.3d 1482, 1997 WL 295308 (7th Cir. May 28, 1997) (Table).

### D. *Post–Remand Plan Revision*

After the Court of Appeals affirmed the Court's decision to remand the 1992 Plan for further analysis, the Forest Service considered three options for how to proceed: (1) operate under the Court's order effectively barring ATV/OHM use in the Shawnee, (2) immediately revise the existing EIS to cure the deficiencies noted in the Court's order,[4] or (3) begin revision of the 1992 Plan, including ATV/OHM and cumulative effects analysis, earlier than anticipated. By the spring of 1998, the Forest Service chose the third option—to include the further analysis required by the Court before allowing ATV/OHM use in the Shawnee as a part of the EIS to support a revision of the 1992 Plan. The Forest Service chose this option, in part, because of the need to comprehensively analyze the cumulative effects of ATV/OHM use with other forest uses, which it believed could not be practically done in a stand-alone EIS limited to the ATV/OHM issue.

The plan revision process began in the fall of 1999 with steps to identify the areas of the 1992 Plan that needed to be changed in light of the Court's order and new Congressional mandates. This process is commonly called "scoping." In late 2000, scoping resulted in a draft document identifying the areas of the 1992 Plan that needed to be changed in a revised plan ("Need for Change" document). The final Need for Change document was published in the spring of 2002 after public comment on the draft document. Around the same time, the Forest Service issued a notice of its intent to prepare an EIS for revising the 1992 Plan. Each of these steps included discussion of the ATV/OHM issue.

The Forest Service expected a draft EIS and plan to be available for public comment in late 2003 and the final EIS and plan by the fall of 2004. However, the Forest Service informed the Court at a status hearing on this case that the schedule has been pushed back.

### E. *This Litigation*

This case arises in part from the Forest Service's course of action after the Court of Appeals' decision affirming the remand of the 1992 Plan. Shawnee Trail Conservancy ("STC"), BlueRibbon Coalition, Inc. ("BlueRibbon"), Illinois Trail Riders ("ITR") and Illinois Federation of Outdoor Resources ("IFOR"), the plaintiffs in this

---

4. The Court is disturbed by the way this option is presented in the "Managing Team Notes for 6/25/97." (AR 1–C–3 at 1–2) That document proposes that the Forest Service supplement the existing EIS with new data and analysis. It further speculates that the Regional Forester would not need to reissue another Record of Decision but could simply write a note saying that in light of the new information, he had decided to go with the old decision. This apparent foregone conclusion that the new analysis would yield the same result is hardly the "hard look" required by NEPA.

case, represent outdoor enthusiasts who seek to enjoy the outdoors through multiple uses including ATV/OHM use and horseback riding. Their complaint, filed March 26, 2002, consists of four counts. Count I alleges that the defendants have failed to conduct further analysis of ATV/OHM use on the Shawnee in contravention of the Court's September 25, 1995, order. Count II alleges that the defendants have failed to conduct ATV/OHM management planning, including analysis involving public input to come up with a plan with accompanying maps and annual review of that plan, as required by 36 C.F.R. part 295. Count III has two aspects. First, it alleges that the defendants have failed to allow equestrian use of "user created trails" that preexisted the 1992 Plan as provided for by the 1992 Plan. Second, it alleges that the defendants have altered the boundaries and/or expanded the acreage of four specific areas where ATV/OHM and equestrian use is restricted—Natural Areas ("NAs")—without further amending the 1992 Plan, in violation of the 1992 Plan itself. Count IV alleges that the defendants have refused to maintain roads and trails, including equestrian trails that preexisted the 1992 Plan, sufficiently to meet the needs of recreation and multiple uses. The plaintiffs claim that all of the alleged actions violate §§ 706(1) and (2) of the APA and seek judicial review under that statute.

The defendants point to three general flaws in all of the plaintiffs' claims. First, the Forest Service argues that the plaintiffs have failed to show that it had a clear duty to do the things the plaintiffs fault them for not doing. Second, they note that none of the things the plaintiffs want the Forest Service to do amount to "final agency action" and are therefore unreviewable under the APA. Third, the defendants argue that the actions the plaintiffs seek are not ministerial in nature because they require exercising agency expertise and discretion in allocating resources and therefore cannot be enforced under the APA. The Sierra Club and RACE were allowed to intervene as defendants on January 27, 2003. They raise similar objections as well as a challenge to the plaintiffs' Article III standing to bring this action.

## II. Article III Standing

The defendant-intervenors raise Article III standing issues briefly in the brief in support of their summary judgment motion. Def. Int. Mem Supp. Summ. J at 4, n. 1. The plaintiffs did not address the issue in its response brief. The Court must satisfy itself that the plaintiffs have Article III standing because it implicates constitutional limits on the Court's power. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

A plaintiff has Article III standing to sue if it can satisfy three requirements. First, it must show that it has suffered an "injury in fact," that is, that it has suffered a concrete, particularized and actual or imminent harm, not one that is conjectural or hypothetical. *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Second, it must show that there is a fairly traceable causal connection between the harm and the defendant's conduct. *Id.* Third, it must show that it is likely that the requested relief will redress the harm. *Id.* at 101, 118 S.Ct. 1003; *see Steel Co.*, 523 U.S. at 102–03, 118 S.Ct. 1003; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The party invoking federal jurisdiction bears the burden of establishing that it has Article III standing to sue. *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130. A plaintiff raising only a generally avail-

able grievance about government, claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large, does not state an Article III case or controversy. *Id.* at 573–74, 112 S.Ct. 2130. While allegations of injury may suffice at the motion to dismiss stage of a case, in response to a summary judgment motion a plaintiff can no longer rely on his allegations but instead must set forth specific facts in affidavits or other evidence showing that Article III standing exists. *Id.* at 561, 112 S.Ct. 2130; *National Wildlife Fed'n,* 497 U.S. at 888–89, 110 S.Ct. 3177.

The plaintiffs in this case, which are groups or associations, have made general allegations in their complaint that their members use the Shawnee. Specifically, STC alleges that its members "recreate in and enjoy the beauty of the Shawnee and other National Forests and intend to continue such activities in the future." Compl. at 3. BlueRibbon alleges that its members "have visited the areas affected by the actions and inactions described herein through various means of motorized and nonmotorized access to conduct varied outdoor pursuits, and have concrete plans to conduct such activities in the future to the extent authorized by Defendants." *Id.* at 3–4. ITR alleges that its members "travel many miles to be able to ride their horses on the trails in the Shawnee National Forest" and "have definite plans to ride horses on Shawnee National Forest trails in the future to the extent authorized by Defendants." *Id.* at 4. IFOR alleges that its members "recreate in the Shawnee National Forest and have definite plans to do so in the future to the extent allowed by Defendants." Compl. at 4.

■ The plaintiffs have attached to their motion for summary judgment an affidavit from Clyde Schmidt ("Schmidt"), a member of STC and BlueRibbon. In that affidavit, Schmidt states that STC's members "recreate in and enjoy the beauty of the Shawnee and other National Forests" and have an interest in being able to be "advised of, and participate in, legislative and administrative processes which might affect access to, and uses upon, Forest lands." He also states that BlueRibbon's members "use motorized and non-motorized means, including off-highway vehicles, horses, mountain bikes, and hiking, to access National Forest Lands throughout the United States, including lands in the Shawnee National Forest." Schmidt states that he uses the Shawnee in a variety of ways but is not able ride his motorcycle on trails in the Shawnee with his friends and family, is not able to obtain a "Forest Visitor Map" showing the network of designated roads and trails in the Shawnee, and has not been allowed to perform volunteer maintenance work on certain roads.

With their supplemental brief ordered by the Court, the plaintiffs have also attached an affidavit from Darrell Perisho ("Perisho"), a member of STC. In his affidavit, Perisho states that he has "regularly visited the Shawnee National Forest by vehicle, foot and horseback since 1988" and that he has visited four NAs (only one of which, Double Branch Hole NA, is involved in this suit). He alleges that the Forest Services' location of boundaries of those four NAs has "adversely impacted the recreational and aesthetic enjoyment of the Forest for me . . . ."

The allegations in Schmidt's and Perisho's affidavit are sufficient to carry the plaintiffs' burden at the summary judgment stage of demonstrating that they have Article III standing to sue for some, but not all, of the plaintiffs' claims.

### A. ITR and IFOR

 The Court first turns to the two plaintiff organizations of which neither Schmidt nor Perisho are members—ITR and IFOR. Neither group has alleged any injury to the group itself, so it must be relying on injury to its members to establish standing. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Despite the allegations in the complaint, neither ITR nor IFOR has pointed to any evidence whatsoever that any of its members have actually been, or will imminently be, injured in a concrete and particularized way because of action by the defendants. Their general allegations in the complaint that their members use the Shawnee and have concrete plans to do so in the future are simply not enough *at the summary judgment stage* to establish Article III standing to bring this lawsuit.

### B. STC and BlueRibbon

#### 1. Counts I and II

As for STC and BlueRibbon, they may rely on Schmidt's and Perisho's affidavits. As for Counts I and II, the plaintiffs have presented evidence that Schmidt has suffered an injury by not being able to ride his motorcycle in the Shawnee with his friends and family.[5] While Schmidt does not directly state that he has concrete plans in the future to ride in the Shawnee (he cannot, in fact, have such plans in light of the ban on ATV/OHM use), Schmidt's situation is distinguishable from the facts in *Defenders of Wildlife*, which involved a challenge to a rule interpreting the Endangered Species Act to apply only to actions within the United States or on the high seas. *Defenders of Wildlife*, 504 U.S. at 557–58, 112 S.Ct. 2130. In that case, one plaintiff averred that she had visited Egypt once to view the endangered nile crocodile and intended to do so again. *Id.* at 563, 112 S.Ct. 2130. Another plaintiff averred that she had traveled to Sri Lanka once to view endangered species such as the Asian elephant and the Leopard and that she intended to do so again. *Id.* at 563–64, 112 S.Ct. 2130. The Court held, "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564, 112 S.Ct. 2130.

Despite the broad language of *Defenders of Wildlife*, the Court finds that the instant case presents a different factual situation. Schmidt lives near the Shawnee and his visits are a part of his lifestyle. He has regularly visited the Shawnee in the past and can easily return there on any given day. It does not require any future planning for him to make a return trip. Thus, it is more probable than not that he will visit the Shawnee in the future and not be able to use the Shawnee as he would like— to ride his motorcycle. By contrast, the plaintiffs in *Defenders of Wildlife* had only made one visit to the area in question, and

---

**5.** It appears that Schmidt may be able to ride his motorcycle off roads *alone* with an ATV access permit for people with disabilities. He obtained such permits in September 1997, September 1998 and October 1999 (Doc. 32, Exh. 1). To the extent that the plaintiffs may be seeking to vindicate injuries suffered by Schmidt's friends and family, they have not established standing to assert such a claim.

it would not be easy for them to return on the spur of the moment at any given time. Because those plaintiffs are much less likely to use the affected areas in the future, it is reasonable to require them to have concrete plans for a trip to prove that they have standing to challenge the proposed action.

Furthermore, *Defenders of Wildlife* recognizes that a person living adjacent to a site which may be affected by a government action (or inaction, as the case may be) can have standing to challenge that action. *Id.* at 572, n. 7, 112 S.Ct. 2130. Courts interpreting *Defenders of Wildlife* have found that parties have standing to challenge agency action by showing that they use the affected area on a regular basis and will do so in the future. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 183–84, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1303–04 (9th Cir.1993) (members of organization stated that they had visited forest on a regular basis, and that their use and enjoyment of the forest would be affected by adoption of the plan); *Seattle Audubon Soc'y v. Moseley*, 798 F.Supp. 1484, 1487–88 (W.D.Wash.1992) (plaintiffs had standing where they averred that they visited forest frequently in the past, and had plans to return in the future).

For these reasons, and in light of the record as a whole, the Court interprets Schmidt's use of the present tense to describe his use of the Shawnee to imply a continuing willingness and ability to use the Shawnee for off-road motorcycle riding. Thus, his injury is actual or imminent.

Schmidt's injury is fairly traceable to the defendants' failure to complete the environmental analysis and travel planning that would result in a decision either permitting or forbidding ATV/OHM use in the

Shawnee and the appropriate information and maps to publish such a decision. Although completion of the analysis would only identify corridors where ATV/OHM use is permitted (if that is indeed the result of the analysis), it is likely that actual ATV/OHM trails upon which Schmidt could ride would be designated in the future. Thus, STC and BlueRibbon have standing to pursue Counts I and II.

### 2. *Count III*

In Count III, the plaintiffs' complain that NA boundary changes effectively block some "user created" equestrian trails which would otherwise be open under the 1992 Plan. However, with one exception, neither Schmidt nor Perisho has alleged that they use or will use the four NAs at issue in this suit or specifically that they have suffered or will suffer any concrete injury to their ability to use the "user created" equestrian trails that those boundaries effectively block. In *National Wildlife Federation*, the Supreme Court held that a statement that a plaintiff used land "in the vicinity" of land affected by agency action was not sufficient to establish that she was aggrieved by the agency action. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Like the insufficient statements in *National Wildlife Federation*, Schmidt's and Perisho's affidavits stating that they use land in the Shawnee generally are insufficient to establish their standing to sue with respect to any particular NA.

The one exception is Perisho's affidavit alleging that the closure of "user created" equestrian trails due to boundary placement of Double Branch Hole NA "has adversely impacted the recreational and aesthetic enjoyment of the Forest for me." While this is not terribly specific, the Court finds that it is sufficient to state an

actual and imminent injury in fact resulting from the defendant's closure of an equestrian trail in or near Double Branch Hole NA. A court order may redress such an injury if it directs a different placement of the boundary, which would effectively unblock the blocked "user created" trail and allow Perisho to use the trail again. The Court concludes that STC has Article III standing to contest the placement of Double Branch Hole NA boundaries.

### 3. *Count IV*

As for Count IV, Schmidt's affidavit and its attachments establish Schmidt's readiness to use trails in the Shawnee and his attempts to work with the Forest Service to maintain certain roads that are not maintained to standards in the 1992 Plan. Thus, he would be actually or imminently affected by the quality of trail and road maintenance and by the Forest Service's failure to allow him to participate in that maintenance. The injury is fairly traceable to the defendants, and could be redressed by a Court order. Accordingly, STC and BlueRibbon have standing to bring Count IV.

For the foregoing reasons, ITR and IFOR do not have standing to bring the claims in this case, and those claims must be dismissed for lack of jurisdiction. STC has Article III standing to bring Count III as it relates to Double Branch Hole NA, and both STC and BlueRibbon have standing to bring Count IV. Accordingly, the Court must dismiss all other claims in this case for lack of jurisdiction.

## III. Reviewability under the Administrative Procedure Act

Alternatively, the Court must dismiss this case because it is not reviewable under the APA.

### A. *Review under the APA*

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In the context of a review of administrative agency action, as is presented in this case, a court is limited to a review of the materials that were before the agency at the time of its decision. *Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 443–44 (7th Cir.1990).

### 1. *Agency Action*

Because the plaintiffs allege that this case involves judicial review of an agency's decision, the Court's resolution of this case is subject to a narrow standard. Under the APA, agency actions may be overturned only if they are:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law. . . .

5 U.S.C. § 706(2); *see Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995).

 To be reviewable under the APA, an agency action must be final and the plaintiff must have been adversely affected or aggrieved by that action. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); 5 U.S.C. §§ 702 & 704. In order to be considered final, an agency action must (1) mark the consummation of an agency's decisionmaking process and (2) determine rights or obligations or have legal consequences. *Bennett v. Spear*, 520 U.S. 154,

177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *see Franklin v. Massachusetts,* 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). Non-final actions are not reviewable unless authorized by the substantive statute alleged to have been violated. *National Wildlife Fed'n,* 497 U.S. at 882, 110 S.Ct. 3177.

### 2. *Agency Inaction*

■ With respect to agency inaction, as opposed to agency action, a reviewing court must compel an agency to act if action has been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see Norton v. Southern Utah Wilderness Alliance,* —— U.S. ——, ——–——, 124 S.Ct. 2373, 2378–79, 159 L.Ed.2d 137 (2004) ("*SUWA*"); *Valona v. United States Parole Comm'n,* 165 F.3d 508, 510 (7th Cir.1998).

In *SUWA,* the Supreme Court recently clarified the limits of a § 706(1) suit for agency inaction. In that case, an environmental group sued the Bureau of Land Management ("BLM") under § 706(1) alleging that, by allowing ORV use on potential federal wilderness areas, it had failed to comply with a statutory mandate to maintain the wilderness qualities of those areas. *SUWA,* 124 S.Ct. at 2377–78; *see* 43 U.S.C. § 1782(c). The environmental group also complained that the BLM failed to implement wilderness preservation activities contained in its own land use plan, in accordance with which federal law requires BLM lands be managed. *SUWA,* 124 S.Ct. at 2377–78; *see* 43 U.S.C. § 1732(a).

The *SUWA* Court held that the environmentalists' action was not viable because § 706(1) actions could only be brought where an agency has failed to carry out a discrete, legally required final action. *SUWA,* 124 S.Ct. at 2379; *see* 5 U.S.C. § 551(13) (defining "agency action" to in-

clude the "failure to act"). Final action must be the implementation of a rule, issuance of an order, license or sanction, granting of other relief, the equivalent of any of these things, or the denial of any of these things. *SUWA,* 124 S.Ct. at 2378; 5 U.S.C. § 551(13). The failure to carry out a final action does not, however, include general deficiencies in compliance with statutorily mandated objectives that do not contain discrete commands about how to attain those objectives. *See SUWA,* 124 S.Ct. at 2381. It also does not include the failure to comply with a land use plan unless that plan clearly makes a binding commitment on the agency or reiterates an existing obligation stemming from another source. *Id.* at 2383–84. In sum, the *SUWA* Court held that actions under § 706(1) cannot be brought simply for failure to achieve general statutory objectives or land use plan goals and guidelines. The Court ultimately held that the BLM's statutory mandate to maintain the wilderness characteristics of certain areas was not a discrete enough command and that its land use plan did not did not create any binding requirement on the agency such that they could support a § 706(1) suit. *Id.* at 2381, 2384.

*SUWA* confirmed the understanding § 706(1) suits held by several Courts of Appeals prior to its issuance, including the Seventh Circuit Court of Appeals. Those courts held that § 706(1) suits could only be maintained where there was a clear, mandatory, non-discretionary duty to act, not for situations in which a plaintiff is merely dissatisfied with the way an agency exercises its discretion. *See Home Builders Ass'n v. United States Army Corps of Eng'rs,* 335 F.3d 607, 611–12 (7th Cir. 2003). " 'When agency recalcitrance is in the face of clear statutory duty or is of such a magnitude that it amounts to an abdication of statutory responsibility, the

court has the power to order the agency to carry out its substantive statutory mandates.'" *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir.1998) (citing *Public Citizen Health Research Group v. Commissioner, Food & Drug Admin.*, 740 F.2d 21, 32 (D.C.Cir.1984)). The existence of an actionable duty is a jurisdictional issue; if a plaintiff alleges only discretionary duties, the Court must dismiss the case for lack of jurisdiction. *Ecology Ctr.*, 192 F.3d at 926; *Carpet, Linoleum & Resilient Tile Layers v. Brown*, 656 F.2d 564, 567 (10th Cir.1981).[6]

### B. Failure to Comply with Court's Order (Count I)

In Count I, the plaintiffs allege that the defendants have failed to comply with the Court's September 25, 1995, order. They believe that the order commands the Forest Service to conduct analysis of ATV/OHM uses on the Shawnee and make decisions about the propriety of such uses. The plaintiffs believe that the Forest Service has essentially "packed its bags" and refused to pursue any decision on the issue after the Court's order. They assert that the Forest Service's plans to conduct analysis of ATV/OHM use as a part of the comprehensive process of revising the 1992 Plan does not comply with the Court's order because it could take—and indeed has taken—years to complete that process, and then it could be years more before a project-level decision is made to actually designate ATV/OHM trails. They believe they are "entitled to a Forest Service deci-

sion authorizing or prohibiting [ATV/OHM] use." Pl.'s Final Mem. Summ. J. at 6. The Forest Service's inaction, the plaintiffs contend, amounts to action "unlawfully withheld or unreasonably delayed" under § 706(1) of the APA.

The defendants first argue that the Court's September 25, 1995, order in *Sierra Club* does not create a clear legal duty for the Forest Service to conduct ATV/OHM analysis in any particular way or by any particular time. Second, the defendants argue that, even if ATV/OHM use analysis was mandatory, such analysis is not final agency action under *Bennett* and cannot therefore be compelled by the Court. Third, the defendants argue that ATV/OHM analysis is not reviewable under the APA because it is not ministerial and, on the contrary, is committed to the discretion of the agency. Fourth, the defendants claim that they are making reasonable progress toward completing the requested analysis, albeit not as fast as the plaintiffs would like. They point to the prior two plans—the 1986 and 1992 Plans—and litigation spurred by their deficiencies to justify moving with "deliberation and caution" in the plan revision process. Finally, the defendants believe that the proper way for the plaintiffs to seek to enforce one of the Court's orders is not by seeking review under the APA but by seeking contempt sanctions in *Sierra Club*.

The defendant-intervenors pick up this thread. They characterize this lawsuit as an end-run around Federal Rule of Civil

---

**6.** Courts have held that the principal limitations for issuance of mandamus under 28 U.S.C. § 1361 also govern limitations on the use of § 706(1). *SUWA*, 124 S.Ct. at 2379; *Carpet, Linoleum & Resilient Tile Layers*, 656 F.2d at 566–67 (like mandamus, § 706(1) is appropriate "only when the person seeking such relief can show a duty owed to him by the government official to whom the writ is directed that is ministerial, clearly defined

and peremptory.") The Seventh Circuit Court of Appeals has held that it has mandamus jurisdiction "only when a clear, plainly defined, and peremptory duty on the federal defendant is shown...." *Save the Dunes Council v. Alexander*, 584 F.2d 158, 162 (7th Cir.1978); *accord Burnett v. Bowen*, 830 F.2d 731, 738–39 (7th Cir.1987) (mandamus provides remedy only where defendant owes a clear non-discretionary duty).

Procedure 71, which limits who may enforce a court order such as those entered in *Sierra Club* to those for whose benefit the order was entered. They also accuse the plaintiffs of attempting to sever the Court's September 25, 1995, order and March 20, 1996, injunction by pressing the Forest Service to complete only one part of the EIS and plan revision directed by the Court to the detriment of the other parts, including the direction to analyze cumulative effects.

■ The Court first turns to the plaintiffs' allegation of improper agency action under § 706(2). Although in the complaint the plaintiffs give lip service to review under § 706(2), even a cursory review reveals that there is no reviewable "final agency action" alleged in Count I. *See* 5 U.S.C. § 704. The plaintiffs essentially admit this by failing to argue in their summary judgment motion that § 706(2) provides the correct standard of review. In fact, the Forest Service's decision about how and when to conduct ATV/OHM use review on the program level does not meet the *Bennett* finality test. *See Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154 (1997). Such a decision does not mark the consummation of an agency decisionmaking process but instead reflects an interim or interlocutory decision to postpone the decisionmaking process to a more convenient time and to a more comprehensive process. It is not, as the plaintiffs imply, an affirmative agency decision to prohibit ATV/OHM use in the Shawnee or an affirmative agency decision not to designate ATV/OHM trails.

In addition, the Forest Service's decision to envelope the ATV/OHM analysis in the 1992 Plan revision analysis does not determine any rights or obligations and does not have any legal consequences that flow from it. It does not take away any right to ride an ATV/OHM or to the existence of ATV/OHM trails in the Shawnee. It is simply a timing decision that does not change the legal landscape in the slightest for any of the parties involved in this case. There are no direct consequences that command, allow or forbid anything different from the *status quo*. Because the Forest Service's decision to analyze ATV/ OHM use in the Shawnee as a part of its comprehensive plan revision is not a final decision, any review the plaintiffs seek cannot be under § 706(2) of the APA but must instead be under § 706(1), the "action unlawfully withheld or unreasonably delayed" prong.

The Court now turns to the portion of Count I that the plaintiffs bring under § 706(1) alleging a failure to act. The Court does not have jurisdiction to hear Count I under § 706(1) because the plaintiffs have pointed to no discrete, legally required, non-discretionary duty imposed by Congress for the Forest Service to act.

■ As a preliminary matter, no party squarely addresses a fundamental question—whether a court order, as opposed to a statute or regulation, can create a duty enforceable under § 706(1). The defendant-intervenors' Rule 71 argument touches on the issue in an oblique way, pointing out that the proper way to enforce the *Sierra Club* order and injunction is through the procedures set forth in the Federal Rules of Civil Procedure. No party has pointed to, and the Court has not been able to locate, a single case in which a court has exercised jurisdiction under § 706(1) to compel action commanded by a judicial mandate, as opposed to a congressional mandate. Congress enacted the judicial enforcement provisions of the APA in part to provide a mandatory mechanism to enforce its own statutory commands. *See Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir.1999) (holding that § 706 was designed to curb

judicial discretion by forcing courts to command agencies to comply with Congressional mandates); *see also Marathon Oil Co. v. Lujan,* 937 F.2d 498, 500 (10th Cir.1991) (noting that "[a]dministrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform."); *Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 80 (D.C.Cir.1984) (holding that one factor to be considered in determining reasonableness of agency delay is a timetable established by Congress). The Federal Rules of Civil Procedure, on the other hand, provide the mechanism for enforcing judicial mandates. Because the APA does not waive the defendants' sovereign immunity for cases asserting a violation of judicial mandates, the Court does not have jurisdiction to hear this claim. *See FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

Even if the APA was designed to enforce judicial mandates, a further jurisdictional hurdle prevents the plaintiffs from prevailing on Count I. The Court's *Sierra Club* order and injunction simply do not impose upon the Forest Service a clear and discrete duty to perform further analysis of or to render a decision authorizing or prohibiting ATV/OHM use in the Shawnee. On the contrary, the Court's order and injunction impose conditions that must be met before ATV/OHM corridors may be designated in the Shawnee. They say, in effect, *if* the Forest Service wishes to provide for ATV/OHM use in its forest plan, *then* it must conduct further analysis. The timing and method of that analysis are left to the discretion of the Forest Service. The Court's order contains nothing mandating in the abstract that the conditions must be met, simply that further action cannot be taken *until* the conditions are met. It is, in reality, an order to *refrain* from making a decision absent full information regarding the relevant environmental facts. It does not prevent the Forest Service from deciding, in its forest planning discretion, that ATV/OHM use should not be pursued in the Shawnee. In fact, had the Forest Service declined to proceed at all toward ATV/OHM corridor designation, it would not be in violation of the Court's order or injunction. That it has exercised its discretion to even investigate the feasibility of opening the Shawnee to ATV/OHM use is not due to any clear, discrete, mandatory, non-discretionary duty imposed by the Court's rulings in *Sierra Club.* It is attributable to its own exercise of discretion to evaluate possible ATV/OHM use in the Shawnee.

In light of the fact that Count I does not present a claim reviewable by the Court under § 706(2) because it does not complain of a final agency action aggrieving the plaintiffs or under § 706(1) because it does not allege a clear, discrete, mandatory, statutory duty of the defendants to act, the Court does not have jurisdiction over this claim. Therefore, there is no need to address the reasonableness of the time frame and manner in which the Forest Service has chosen to conduct further analysis of the ATV/OHM issue.[7]

C. *Failure to Conduct Travel Planning (Count II)*

In Count II, the plaintiffs allege that the Forest Service has failed to carry out its

7. The Court cannot resist noting that this case is not far from being moot. As expected, the Forest Service will soon render the exact decision the plaintiffs seek, in all likelihood within a the next year, when it issues its new forest plan and its supporting EIS. The plan revision process, which began less than a month after the Court of Appeals affirmed the Court decision to vacate the 1992 Plan, has been marching slowly but steadily towards a new plan that includes a decision on ATV/OHM use.

travel planning duties as set forth in the NFMA and its implementing regulations. Specifically, the plaintiffs claim that the Forest Service has failed (1) to conduct travel planning by making decisions to allow, restrict or prohibit vehicle uses of certain areas in the Shawnee, (2) to issue a travel plan, (3) to publish and make available to the public maps that describe the regulations affecting vehicle use, (4) to review annually ATV/OHM management designations, or (4) to allow public participation in the travel planning process. The plaintiffs point to 36 C.F.R. part 295 as the authority for the foregoing duties.

The plaintiffs also claim that the Forest Service has taken improper action by abandoning the ATV/OHM recreational opportunities authorized by the 1986 and 1992 Plans. They believe it should have complied with those plans or revised them to allow ATV/OHM use in the Shawnee. The Forest Service's decision to abandon pursuit of the ATV/OHM recreational opportunities, the plaintiffs argue, is an arbitrary and capricious decision that falls "short of statutory right" under 5 U.S.C. § 706(2)(c). It believes that the Court's *Sierra Club* injunction forbidding "any order or decision notice authorizing or permitting the use of ATV/OHMs in the Shawnee National Forest" leaves room for the Forest Service to authorize or permit the use of ATV/OHMs in portions of the Shawnee.

Again, the Forest Service argues that the travel planning activities sought by the plaintiffs are not final agency action and are therefore unreviewable under the § 706(2). It also argues that the plaintiffs' claim regarding the adequacy of the Forest Service's action is not reviewable under § 706(1) which is aimed toward failures to act at all, not failures to sufficiently act. As for the substance of the plaintiffs' claims, the Forest Service contends that it has complied with all requirements. It has exercised its discretion in conducting travel planning activities (like monitoring, mapping and conducting a forest-wide road analysis), it is in the process of making a decision to allow, restrict or prohibit ATV/OHM use in the ongoing revision to the 1992 Plan, and it has allowed public participation in those processes.

The defendant-intervenors argue that the travel planning in the 1992 Plan satisfied the applicable travel planning requirements, although the ATV/OHM plans cannot be implemented after *Sierra Club*. The 1992 Plan included maps for the ATV/OHM and equestrian/hiker trail corridors. The defendant-intervenors also note the Forest Service has conducted other travel planning activities, including publishing maps, since the 1992 Plan.

### 1. *Travel Planning Duties*

■ The Court will first address the alleged action "unlawfully withheld or unreasonably delayed" under § 706(1). The travel planning duties that the plaintiffs believe are being unlawfully withheld or unreasonably delayed are contained within 36 C.F.R. part 295. The specific duties they point to in that part are as follows:

> On National Forest System lands, the continuing land management planning process will be used to allow, restrict, or prohibit use by specific vehicle types off roads.

36 C.F.R. § 295.2(a);

> [I]nformation and maps will be published and made available to the public, describing: (a) The regulation of vehicular use. (b) Time periods when use is allowed, restricted or prohibited. (c) The type of vehicle regulated.

36 C.F.R. § 295.4; and

> Forest Supervisors will annually review off-road vehicle management plans and

temporary designations implemented since the last annual review. If the plan needs revision, the public will be given the opportunity to participate in the review as stated in § 295.3.

36 C.F.R. § 295.6.

This case clearly does not involve the Forest Service's genuine failure to take a discrete action in the face of any required duty, as explained in *SUWA*. *See Norton v. SUWA*, 124 S.Ct. 2373, 2381 (2004). In truth, this case boils down to the plaintiffs' dissatisfaction with the sufficiency of the Forest Service's action, a claim over which the Court does not have jurisdiction because it does not constitute a true "failure to act," *Ecology Ctr., Inc. v. United States Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999), or a complete abdication of statutory responsibility, *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir.1998). A plaintiff cannot "evade the finality requirement with complaints about the sufficiency of an agency action 'dressed up as an agency's failure to act.'" *Ecology Ctr.*, 192 F.3d at 926 (citing *Nevada v. Watkins*, 939 F.2d 710, 714 n. 11 (9th Cir.1991)).

That is just what the plaintiffs in this case are attempting to do. A close examination of the relevant regulations does not reveal the commands the plaintiffs seem to believe are there. For example, § 295.2(a) states that "the continuing land management planning process will be used to allow, restrict, or prohibit use by specific vehicle types off roads." Essentially, it directs the Forest Service to use the land management planning process to make decisions about off-road vehicle use. It does not, as the plaintiffs would have the Court believe, direct that such decisions be made outside of the comprehensive land management process that has yielded the 1986 and 1992 Plans and which will in the near future yield an even newer plan. Neither

does it direct a precise timetable for when such land management planning processes must occur. These are just the types of broad objectives that the *SUWA* Court found could not support a § 706(1) suit. The Forest Service is in the midst of the "continuing land management planning process" with public input and is in the process of making decisions to "allow, restrict, or prohibit use by specific vehicle types off roads," and the APA does not authorize "undue judicial interference with [the agency's] lawful discretion." *See SUWA*, 124 S.Ct. at 2381.

By the same token, § 295.4 broadly directs the Forest Service to publish information and maps regarding off-road vehicle use without a specific instruction as to any discrete way to implement the publishing. The Forest Service has published information and maps in conjunction with the 1992 Plan and following *Sierra Club's* decision effectively banning such use until the appropriate supporting analysis is done. That maps and information regarding the forthcoming forest plan have not been published yet is not a genuine failure to act when the process of creating publishing those materials is ongoing. Again, § 295.4 does not mandate the type of discrete action that § 706(1) was designed to enforce.

Finally, § 295.6 directs the Forest Service to annually review the ATV/OHM management plan and, if the plan needs revision, to give the public an opportunity to participate in the revision process. The plaintiffs fault the Forest Service for not publishing a formal document embodying such review. However, such review or documentation would be an exercise in futility until the delinquencies in *Sierra Club* are cured and ATV/OHM use is back on the table as an option for forest planning. No revision is possible until the appropriate environmental review is accomplished,

and the Forest Service has decided to conduct that review in the comprehensive land management planning process, a process in which the public has been and continues to be actively involved. The Court cannot say that the Forest Service's failure to annually review a plan that cannot be implemented in light of a court order, while taking steps to create a new plan, constitutes a genuine failure to act.

While the Court has some sympathy with the plaintiffs that they have had to wait many years for another chance for approval of ATV/OHM use in the Shawnee, 36 C.F.R. part 295 simply does not direct the Forest Service to accomplish any discrete action that it is not already working toward. That the process has not been as speedy as the plaintiffs would have liked and has not yet yielded a decision yet does not amount to a genuine failure to act or an abdication of statutory responsibility, and the broad regulatory objectives embodied in part 295 will not support a § 706(1) suit.

In light of the fact that the plaintiffs have not alleged that the Forest Service has genuinely failed to act to comply with any regulation requiring a discrete, mandatory action or has abdicated any statutory travel planning responsibility, the Court does not have jurisdiction over the portion of Count II brought under § 706(1) of the APA.

### 2. Abandonment of ATV/OHM Planning

Count II also contains a claim that the Forest Service has acted in an arbitrary and capricious manner by abandoning the ATV/OHM recreational opportunities authorized by the 1986 and 1992 Plans. Specifically, they point to the Cadiz ATV/OHM travelway planning that was underway when *Sierra Club* was decided. This claim could just have well have been char-acterized as a "failure to act" by not pursuing the Cadiz travelway plans. Indeed, it is the flip side of the "inaction" argument discussed in the previous section.

Even if such a claim were viewed under the review standards of § 706(2), the Court does not have jurisdiction to hear this claim. The decision of which the plaintiffs complain is not a final agency action under *Bennett,* that is, it does not mark the consummation of an agency's decisionmaking process and it does not determine rights or obligations and legal consequences do not flow from it. *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The administrative record clearly reflects that the Forest Service did not go through a decisionmaking process to abandon plans for the Cadiz travelway. On the contrary, it simply decided to postpone it in light of *Sierra Club's* complete prohibition of decisions allowing ATV/OHM use pending further analysis. It was, in essence, a decision to postpone the decisionmaking process itself, not the culmination of that process. Furthermore, the decision to postpone the process did not determine any rights or obligations and did not have any legal consequences. It was not a decision to forever abandon the Cadiz travelway plans or ATV/OHM use in the area or to allow such activity. It was simply a timing decision without legal consequence. For these reasons, the Court finds that the decision to postpone plans for the ATV/OHM use in the Forest, including planning the Cadiz ATV/OHM travelway, was not a final decision subject to review under § 706(2) of the APA.

The Court cannot leave this topic, however, without making one final observation. The Court is astounded at the plaintiffs' suggestion that the *Sierra Club* decision could somehow be interpreted to permit ATV/OHM use in the Shawnee before fur-

ther environmental analysis is completed or that the Forest Service is required to amend the 1992 Plan before abiding by the *Sierra Club* injunction. The plaintiffs appear to have completely missed the thrust of the Court's fairly plainly worded *Sierra Club* injunction: "The Forest Service shall not issue any decision notices or implement any decision involving the construction, maintenance, or designation of any trails for the use of all terrain vehicles and/or off-highway motorcycles ('ATV/OHM') in the Shawnee National Forest, nor shall the Forest Service issue any order or decision notice authorizing or permitting the use of ATV/OHMs in the Shawnee National Forest. . . ." With the limited exceptions noted in the injunction, the ATV/OHM plans authorized by the 1986 or 1992 Plans were effectively "unauthorized" by *Sierra Club,* and the Forest Service may not implement them until the conditions set forth in NEPA, as noted in *Sierra Club,* are met. The plaintiffs' suggestion that the Forest Service may do otherwise, or that it must jump through further NEPA hoops and the plan amendment process before abiding by the injunction, is wrong.

### D. *Alteration of NA Boundaries (Count III)*

In Count III, the plaintiffs charge that, after the 1992 Plan was adopted, the Forest Service altered the boundaries of four NAs (one of which contains a research natural area ("RNA")) without amending the 1992 Plan, as it is required to do whenever it wants to establish a new NA or to change or adjust boundaries for existing NAs.[8] Specifically, the plaintiffs claim that Burke Branch NA was established to include 206 acres but now includes 335 acres, that Double Branch Hole NA was established to include 85 acres but now includes 100 acres, that Jackson Hole NA was established to include 116 acres but now includes 160 acres, and that Jackson Hollow NA was established to include 289 acres but now includes 280 acres. The plaintiffs claim they were deprived of their opportunity to comment on and appeal the changes under NEPA and federal regulations.

The plaintiffs argue that these changes had consequences to equestrian users because some such boundary changes made certain equestrian trails off limits. Under the 1992 Plan, equestrian use is allowed on "user created" trails outside areas with a management prescription of 8.2 (which includes NAs) that existed prior to adoption the 1992 Plan. A number of "user created" trails are near NA boundaries. The plaintiffs claim that the trails would have been outside the boundaries, and thus open to equestrian traffic under the 1992 Plan, had the Forest Service not impermissibly altered those boundaries to include the "user created" trails in the NAs. The plaintiffs claim that in some instances the original NA boundaries are not marked precisely enough on the original maps and that the Forest Service is now interpreting the original markings in the way least favorable to the plaintiffs such that it prevents legal traffic on "user created" trails.[9]

8. In their supplemental brief ordered by the Court, the plaintiffs complain of additional alleged NA boundary changes. Since those alleged changes were not raised in the complaint, they are not at issue in this case and the Court need not address them.

9. The plaintiffs also complain in their motion about the entry and alleged insufficient post-

ing of a Forest Service closure order prohibiting all equestrian use of trails in NAs. This argument was not raised in the complaint, which complains only of the failure to allow use of the "user-created" equestrian trails that preexisted the 1992 Plan and that are outside the NAs. For this reason, the Court will not address this argument.

The defendants respond that the acreage measures set forth in the 1992 Plan do not set the exact bounds and are not precise measures of the respective NAs but are instead estimates of the actual acreage of the areas based on hand-drawn maps. At a minimum, the 1992 Plan provides that these areas include the areas determined to be NAs in the Illinois Natural Areas Inventory ("INAI") prepared by the State of Illinois. Since the 1992 Plan and in light of the evolution of global positioning technology, the Forest Service has refined its estimates of the boundaries based on what was actually noted on the ground to have NA characteristics and has begun marking those boundaries on the ground to prevent resource damage, as provided in the 1992 Plan. Thus, the Forest Service attributes the smaller changes in acreage for Burke Branch NA, Double Branch NA and Jackson Hollow NA to a change of methods used to measure the areas and to initial posting on the ground of previously unmarked boundaries, not to a change of boundaries. With respect to the rather drastic alleged increase in the area of Burke Branch NA, the Forest Service notes that the 206–acre measurement cited by the plaintiffs corresponds to the Burke Branch RNA, a subset of the Burke Branch NA. The Burke Branch NA was noted in the 1992 Plan to contain 300 acres. As for Jackson Hole, the Forest Service attributes the acreage increase to an inaccurate initial estimate and the need to conform the boundaries in their initial marking to include the entire INAI area, as required by the 1992 Plan.

The defendant-intervenors reiterate that the changes in acreage are a result not of boundary changes or adjustment but of new calculations based on on-the-ground

global positioning readings as opposed to estimates from hand-drawn maps. They argue that the on-the-ground determinations of the boundaries are not final action under § 704 of the APA but are simply implementation of the 1992 Plan direction to establish on-the-ground boundaries for specific sites considering the site's recognized features or values.

As a preliminary matter, the Court notes that the plaintiffs cite federal regulations that are no longer accurate. They cite the regulations in part 219 as they existed prior to November 9, 2000. On November 9, 2000, the Department of Agriculture made wholesale changes to the relevant regulations, making prior citations obsolete. *See* 67 Fed.Reg. 67,568 (Nov. 9, 2000) (codified at 36 C.F.R. pt. 219). Since the plaintiffs filed this case in March 2002, sixteen months after the regulations changed, and filed their summary judgment motion in March 2003, twenty-eight months after the regulations changed, they should have cited the revised regulations. The failure to do so is tantamount to making an argument without citing any legal support and would be grounds, by itself, for denying the plaintiffs' motion for summary judgment on Count III. Nevertheless, the Court will consider the merits of the cross motions for summary judgment as they relate to Count III.

■■■ Although the plaintiffs mention § 706(1) in passing in their complaint, the gravamen of Count III is the Forest Service's alleged action in changing the boundaries of four NAs. Thus, this claim may be reviewed, if at all, only under § 706(2)'s provisions for review of agency action.[10] Thus, the Court must ask wheth-

10. To the extent that the complaint may be interpreted as a claim that the Forest Service is failing to act by failing to allow equestrian use of "user created" trails *within* the four relevant NAs, the plaintiffs have pointed to no clear duty that has been violated. The 1992

er the Forest Service has taken any final agency action.

As with the other counts of the plaintiffs' complaint, the Court does not have jurisdiction over Count III. The plaintiffs have alleged no final agency action. This holding turns on the conclusion that any action taken by the Forest Service is simply an implementation of the 1992 Plan, as opposed to a final action in contravention of the 1992 Plan that was the culmination of a decisionmaking process. *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). A review of the administrative record reveals that none of the Forest Service's actions contravene the 1992 Plan and are, in fact, anticipated by that plan. Furthermore, while the plaintiffs believe that legal consequences flowed from the on-the-ground locations of the NA boundaries—the closing of portions of several "user created" trails—those consequences actually flowed from the 1992 Plan, not from any changes to NA boundaries subsequent to the 1992 Plan.

As noted earlier in this order, the Forest Service manages the four relevant NAs under Management Prescription 8.2, which aims to preserve and protect the unique scientific or educational values of those areas. With respect to NAs, the 1992 Plan provides, in pertinent part,

> Site specific prescriptions will address the recognized features or values within each inclusion, establish on the ground boundaries and finalize management direction on a site by site basis through consultation with cooperating agencies, specialists, and groups.

\* \* \* \* \* \*

> The boundaries of 8.2 Management Areas and inclusions will encompass, as a minimum, the area as mapped in the Illinois Natural Areas Inventory. Changes in area boundaries, values being protected, and the addition or elimination of areas will be accomplished though [*sic*] Forest Plan amendment.

1992 Plan at IV–19. The 1992 Plan lists all NAs along with their size in acres. 1992 Plan, App. E at E–11 to E–13. Burke Branch is listed as containing 300 acres, Double Branch as containing 85 acres, Jackson Hole as containing 116 acres and Jackson Hollow as containing 289 acres. *Id.* at E–12 to E–13. Global positioning measurements of the areas differed.

It is clear from a review of the 1992 Plan in its totality that it does not define the exact boundaries of the relevant NAs. Despite an apparently definitive listing of the acreage of each NA, those acreage measurements were by their very nature imprecise because they were calculated based on review of originally hand-drawn maps on a much smaller scale than the actual land itself. Furthermore, the text of the 1992 Plan clearly contemplates further action, marking and measurement with respect to each NA, setting only a minimum area that was to be included—INAI natural areas. This is evidenced by the 1992 Plan's provision for specific site prescriptions to establish on-the-ground boundaries, which did not then exist. The record reflects that those boundaries were established on the ground considering the natural features observed in the boundary areas (that is, the scientific or educational features and value that the particular NA was designed to protect). The boundary location was then recorded using global

Plan provides for equestrian use on "user created" trails but excepts those "user created" trails within NAs. 1992 Plan at IV–25 to IV 26. The 1992 Plan creates no clear duty to

allow equestrian use in NAs, and the plaintiffs have pointed to no other possible source of a clear duty. Accordingly, the Court would not have jurisdiction over any such claim.

positioning technology, and those recordings served as the basis for the revised acreage figures. The Court has compared the maps from the 1992 Plan with the maps prepared using the global positioning information. With two exceptions, the boundaries do not differ in any substantial way. No reasonable fact-finder could find that the Forest Service's marking of those boundaries, recording of the position of the markings, and recalculation of acreage figures constituted final agency action apart from that reflected in the adoption of the 1992 Plan.

One exception is Jackson Hole NA. Location of the Jackson Hole NA boundaries on the ground differed significantly from the acreage listed in the 1992 Plan. The record reflects, however, that although the acreage differed significantly, the location of the Jackson Hole NA boundaries on the ground was consistent with the text of the 1992 Plan, which provided that NAs shall include, at a minimum, NAs noted in the INAI. In the case of Jackson Hole NA, on-the-ground siting revealed that the Forest Service's map and acreage calculations missed that goal. The boundaries were corrected to include the entire INAI area and to be in compliance with the 1992 Plan. This correction can only be viewed as a correction of a mapping error, not as a change to any boundary.

The second exception is in the northwest portion of the Burke Branch NA. In 1996, Forest Service personnel "added a very small portion which contained some dry-mesic woods that had been left out when [the Forest Service] had originally marked the boundary." AR 2–C–6 at 13. Dry-mesic upland forest is one of the features sought to be protected by Burke Branch NA and RNA. The area was contiguous to the previously mapped NA and was well defined to stop at a pine plantation. This appears on the map created with global positioning technology as a sort of peninsula or "bump" into non-NA area that was not reflected on the INAI map or the 1992 Plan map. Again, it is clear that the discrepancy between the 1992 Plan map of the Burke Branch NA and the subsequent boundary markings and global positioning map did not result from a final action to add additional territory to the NA but from efforts to accurately mark on the ground the NA as it was originally created and to correct mapping inaccuracies that inadvertently omitted dry-mesic woods that because of their characteristics and location properly fell within the NA. This action was contemplated by and consistent with the 1992 Plan, which directed the Forest Service to establish on-the-ground boundaries on a site by site basis considering the recognized features or values of the NA. *See* 1992 Plan at IV–19. For this reason, the addition of the "bump" to the Burke Branch NA map cannot be viewed as a final agency action but merely the accomplishment of a task directed by the 1992 Plan. However, the Court notes, and the Forest Service admits, that once it employed global positioning technology to establish the NA boundaries on the ground based on the NA characteristics sought to be protected, changes to those boundaries would require plan amendment and its concomitant NEPA analysis.

It is important to understand the multiple "translations" that NA boundaries have been through since each NA's creation. Some discrepancy in those "translations" can be expected and need not necessarily constitute a boundary change. Indeed, decades ago INAI natural areas and NAs were selected based on on-the-ground observations of values and features that the Forest Service or the State of Illinois wanted to protect. The areas actually observed on the ground were then "translated" into maps in what now appears to be a crude fashion in days prior to global posi-

tioning technology. Years later, as directed by the 1992 Plan, the maps were then "translated" back into on-the-ground sites, guided by the original goals of the NA designation—protecting the relevant values and features of the land. Then, the on-the-ground sites were "translated" again into maps using global positioning technology.[11] It is important to keep in mind throughout these many "translations" that the original designation was of actual land, not a drawing on a map. That a recent "translation" sought to stay true to the original designation at the price of straying from a prior mapped "translation" should not be viewed as a change but instead as a refinement. The Court is unwilling to become involved in excessive oversight of the Forest Service's decisions regarding the location of every NA boundary line. Such judicial intervention would be an unwarranted intrusion on the discretion of the Executive Branch's prerogatives.

Even if the change to the Burke Branch NA map could be construed as a final agency action, the plaintiffs have not established that they have been adversely affected or aggrieved by that change, a prerequisite for their standing to sue. *See* 5 U.S.C. § 702. When a plaintiff's standing to sue is challenged, he bears the burden of setting forth specific facts establishing his standing. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). While evidence that plaintiffs recreate and enjoy a specific area may be sufficient to establish that they are adversely affected by final agency action impacting that area, at the summary judgment stage, general or conclusory statements that a few members of an organization use "unspecified portions

of an immense tract of territory," on some portions of which the final agency action may have an impact, are insufficient to establish that a plaintiff is adversely affected. *Id.* at 889, 110 S.Ct. 3177.

As noted in the Court's earlier discussion of Article III standing, the plaintiffs have presented no evidence whatsoever that any of their members have been adversely affected or aggrieved by the marked boundaries of Burke Branch NA. *See* 5 U.S.C. § 702. The plaintiffs have not pointed to any evidence that any member has used or has attempted to use a trail that has been blocked by the Burke Branch NA boundary markings. In the absence of any such evidence, any final agency action that may have been accomplished by the boundary marking of Burke Branch NA is unreviewable under the APA.

In sum, the actions alleged by the plaintiffs in locating the NA boundaries do not constitute final actions subject to review under § 706(2) of the APA. They are not the result of any decisionmaking process and are, on the contrary, the implementation of decisions taken in the 1992 Plan. Alternatively, any final agency action in marking the Burke Branch NA boundaries is not reviewable because the plaintiffs have not demonstrated that they have been aggrieved by the action. For these reasons, Count III is not reviewable and the Court does not have jurisdiction to hear it. Thus, the Court must dismiss Count III for lack of jurisdiction.

### E. Trail Maintenance (Count IV)

██ In Count IV, the plaintiffs charge the Forest Service with failing to maintain roads and trails within the Shawnee sufficiently to meet their safety and recreation-

---

11. The Forest Service alleges, although without evidentiary support, additional "translations" from the original hand-drawn maps to aerial photographs to the professionally drawn topographical maps that are contained in the 1992 Plan.

al needs. Although they do not specifically state it in the complaint, the summary judgment motion and its citations to the administrative record reveal that the plaintiffs' claim focuses on the failure to maintain trails and roads where equestrian use is allowed, not trails restricted to hikers only. The plaintiffs believe that the Forest Service has failed to act in the face of a clear duty set forth in the NFRTA, the NFMA and their respective implementing regulations, as well as a duty in the 1992 Plan to maintain minimum trail standards.

The plaintiffs assert that the Forest Service's reliance on the so-called "Roadless Rule," which prohibits road construction and maintenance in roadless areas of more than 5,000 acres,[12] is misplaced for two reasons. First, they believe that the Roadless Rule authorizes maintenance of "classified" roads and designated trails even within inventoried roadless areas and argue that the Forest Service should be maintaining those roads and trails. Second, they believe that the Roadless Rule cannot be implemented in light of a preliminary injunction issued by another district court and that the rule has been suspended by the Forest Service pending further review. The plaintiffs also fault the Forest Service with failing to use a categorical exclusion to authorize road maintenance projects without further environmental analysis.[13]

The Forest Service argues that its shortcomings in trail and road maintenance do not amount to final agency action—or, in the case of agency inaction, a clear failure to act in the face of a discrete, mandatory, non-discretionary duty—and are therefore unreviewable under the APA. In addition, the Forest Service points to its road and trail maintenance activities, including collaborating with the plaintiffs to maintain trails and implementing categorical exclusions where appropriate, as evidence that it has not utterly failed to act in the face of any maintenance duty.

The defendant-intervenors argue that the Roadless Rule is indeed in effect and justifies the Forest Service's failure to maintain in certain areas of the Shawnee such as Burke Branch NA, an inventoried roadless area. They note that a court of appeals has reversed the district court preliminary injunction forbidding implementation of the Roadless Rule, effectively allowing the Roadless Rule to take effect.

The Court again concludes that it does not have jurisdiction over this claim because there is no allegation that the Forest Service has failed to carry out a discrete, mandatory, non-discretionary duty to act. Instead, it simply contains allegations that the Forest Service has not acted sufficiently enough or quickly enough to satisfy the plaintiffs' recreational desires. This is precisely the kind of broad programmatic inaction complaint foreclosed by *SUWA*.

First, the plaintiffs have simply not alleged a clear, discrete, mandatory, non-discretionary duty. As the source of the duty allegedly unlawfully withheld or unreasonably delayed, the plaintiffs point to various statutory and regulatory sources. In the NFRTA, Congress recognized the

12. These roadless areas were studied and inventoried in the Roadless Area Review and Evaluation II. Therefore, they are often referred to as "inventoried roadless areas."

13. A categorical exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations ... and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4.

importance of roads and trails to achievement of national forest goals:

> The Congress hereby finds and declares that the construction and maintenance of an adequate system of roads and trails within and near the national forests and other lands administered by the Forest Service is essential if increasing demands for timber, recreation, and other uses of such lands are to be met....

16 U.S.C. § 532. This provision, titled "Roads and trails system; Congressional findings and declaration of policy," does not command the Forest Service to do any discrete action. On the contrary, as its title indicates, it simply sets forth Congress's vision about the importance of roads and trails to the multiple uses for which national forests are to be used.

To this end, Congress authorized the Secretary of the Department of Agriculture to acquire, build and maintain a road system in national forests:

> The Secretary is authorized to provide for the acquisition, construction, and maintenance of forest development roads within and near the national forests and other lands administered by the Forest Service in locations and according to specifications which will permit maximum economy in harvesting timber from such lands tributary to such roads and at the same time meet the requirements for protection, development, and management thereof, and for utilization of the other resources thereof.

16 U.S.C. § 535. Again, this statutory provision does not mandate any discrete action by the Forest Service. While it authorizes the Secretary to build and maintain roads, it does not require him or her to do so in any particular way, place or time frame. There is simply no clear, discrete, mandatory duty in this statutory provision.

The regulations implementing the NFRTA come closer to actually creating a mandatory duty, but do not quite make the grade in light of *SUWA*:

> Construction and maintenance work on forest transportation facilities with appropriated funds shall be directed to what is necessary and economically justified for protection, administration, development, and multiple-use management of the federally owned lands and resources served.

36 C.F.R. § 212.4(a). "Forest transportation facilities" include classified roads and designated trails. 36 C.F.R. § 212.1. A careful review of this regulation reveals, however, that rather than establishing a clear duty to act, it sets a goal and directs the Forest Service to work toward that goal. It essentially says that whenever construction or maintenance of roads and trails is funded and accomplished, it shall be done on roads and trails where it is necessary and economically justified in light of Forest Service goals. It serves to guide the use of Forest Service resources as opposed to commanding certain actions to be taken. This is just the type of broad programmatic mandate that *SUWA* held to "lack the specificity requisite for agency action" that can be compelled under § 706(1). *SUWA*, 124 S.Ct. at 2381.

The Roadless Rule also provides no assistance to the plaintiffs in their trail maintenance claim.[14] The rule states that gen-

---

14. In 2001, the District Court for the District of Idaho preliminarily enjoined implementation of this rule, but the Court of Appeals for the Ninth Circuit reversed that injunction. *Kootenai Tribe of Idaho v. Veneman*, No. CV01–10–N–EJL, 2001 WL 1141275 (D.Idaho May 10, 2001), *rev'd*, 313 F.3d 1094 (9th Cir.2002). The plaintiffs claim without supporting citations that, despite reversal of the injunction, the Forest Service has not implemented the "Roadless Rule." However, in the absence of any persuasive evidence or author-

erally "[a] road may not be constructed or reconstructed in inventoried roadless areas of the National Forest System. . . ." 36 C.F.R. § 294.12(a). An exception exists, however, for maintenance of "classified roads," 36 C.F.R. § 294.12(c), which the plaintiffs believe include designated trails. Clearly they do not. A "road" is a "motor vehicle travelway over 50 inches wide, *unless designated and managed as a trail.*" 36 C.F.R. § 212.1 (emphasis added). "Classified roads" are a subset of roads. 36 C.F.R. § 212.1. Since designated trails by definition are not roads, *a fortiori,* they cannot be classified roads, and no possible interpretation of the Roadless Rule could mandate their maintenance.

■ Secondly, to the extent that the plaintiffs argue that the 1992 Plan contains a clear, discrete, mandatory duty to act, *SUWA* is clear that, absent an express agency commitment in a land management plan, such plans cannot alone serve as the basis for a § 706(1) suit. The plaintiffs have pointed to nothing in the 1992 Plan that indicates it was intended to bind the Forest Service to achieve any goal therein. On the contrary, like the plan at issue in *SUWA,* the 1992 Plan is "general statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *SUWA,* 124 S.Ct. at 2383. Such plans "cannot be plucked out of context and made a basis for a suit under § 706(1)." *Id.* at 2384.

Even if the 1992 Plan could have created a discrete, mandatory, non-discretionary duty to maintain trails to certain standards, the plaintiffs have simply not alleged any genuine failure to act in the face of such a duty. Although the plaintiffs have pointed to specific admissions by the Forest Service that trails in the Shawnee do not meet the minimum standards of the

1992 Plan, the record is also replete with evidence that the Forest Service is actively engaged in trail maintenance as permitted in light of budgetary and staff constraints. While the Court believes that the Forest Service may not be using its resources, including its volunteers, in the wisest way possible for the good of the Shawnee as a whole, the Court cannot say that the Forest Service is being recalcitrant or abdicating its responsibility such that it has genuinely failed to act.

Nevertheless, the Court is disturbed by evidence showing that the Forest Service is not making use of the volunteer manpower offered to it in regard to trail maintenance. The Court is aware that the cost of trail maintenance, even when accomplished with free labor, can be staggering. Nevertheless, willing but idle hands are a waste. The Court strongly encourages the Forest Service to examine and modify its allocation of resources to make use of the many volunteers such as the plaintiffs, who appear to be willing and able to accomplish what the Forest Service alone cannot. Manpower invested in setting volunteer activities in motion has the potential to multiply exponentially the Forest Service's productivity. It is a shame that volunteers sit idle while trails decay because bureaucrats cannot find the appropriate supervision or secure the appropriate approval to put them to work.

The Forest Service's shortcomings notwithstanding, because the plaintiffs cannot show that the Forest Service has genuinely failed to act in the fact of a clear, discrete, mandatory, non-discretionary duty to maintain trails in the Shawnee, the Court does not have jurisdiction over Count IV.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the motions for summary judg-

---

ity that the rule is not in effect, the Court assumes that it is being implemented.

ment filed by the Forest Service (Doc. 23) and by the defendant-intervenors (Doc. 21), **DENIES** the motion for summary judgment filed by the plaintiffs (Doc. 18), and **DISMISSES** this case for **lack of jurisdiction**. The Clerk of Court is directed to enter judgment accordingly.

IT IS SO ORDERED.