**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 6, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UTAH ENVIRONMENTAL
CONGRESS,

        Plaintiff-Appellant,

    v.

DALE BOSWORTH, in his official
capacity as Chief of the United States
Forest Service; UNITED STATES
FOREST SERVICE; MARY
ERICKSON, in her official capacity as
Supervisor of the Fishlake National
Forest; and D. FRED HOUSTON, in
his official capacity as Richfield
District Ranger of the Fishlake
National Forest,

        Defendants-Appellees.

No. 05-4102

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:04-CV-643-DAK)**

Joel Ban, WildLaw, Salt Lake City, Utah, for Plaintiff-Appellant.

Mark R. Hagg, Attorney, Environment & Natural Resources Division, Department
of Justice, Washington, D.C. (Kelly A. Johnson, Acting Assistant Attorney
General, and Todd S. Aagaard, Attorney, Environment & Natural Resources
Division, Department of Justice, Washington, D.C., and Elise Foster, Of Counsel,
United States Department of Agriculture, Ogden, Utah, with him on the brief), for
Defendants-Appellees.

Before **HENRY** , **EBEL** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

In 2004, the United States Forest Service approved a 123-acre timber-thinning project to treat beetle-infested trees in Utah's Fishlake National Forest. Its approval was made pursuant to a categorical exclusion, a streamlined process allowing minor projects to be quickly implemented so long as they have no significant effect on the environment. As a result of this decision, Utah Environmental Congress ("UEC") appealed to the district court arguing that the project violated a number of environmental and regulatory provisions. We agree with the district court that the Forest Service properly implemented this project under a categorical exclusion.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I. Background

*A. Statutory and Regulatory Framework*

*1. National Environmental Policy Act*

The National Environmental Policy Act ("NEPA") requires federal agencies such as the Forest Service to analyze environmental consequences before

initiating actions that potentially affect the environment.[1]  In conducting this

analysis, the Forest Service must prepare one of the following: (1) an

environmental impact statement, (2) an environmental assessment, or (3) a

categorical exclusion.  An environmental impact statement involves the most

rigorous analysis, and is required if a proposed action will "significantly affect[]

the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R.

§ 1502.4.

If an agency is uncertain whether the proposed action will significantly

affect the environment, it may prepare a considerably less detailed environmental

assessment.  40 C.F.R. § 1508.9.  An environmental assessment provides

"sufficient evidence and analysis" to determine whether a proposed project will

create a significant effect on the environment.  *Id.*  If so, the agency must then

develop an environmental impact statement; if not, the environmental assessment

results in a "Finding of No Significant Impact," and no further agency action is

required.  *Id.*

In certain narrow instances, however, an agency is not required to prepare

either an environmental assessment or an environmental impact statement.  This

---

[1] The Council on Environmental Quality is responsible for implementing NEPA's planning requirements by promulgating binding regulations.  *See* 42 U.S.C. §§ 4342, 4344(3); 40 C.F.R. §§ 1501–08.  Agencies, such as the Forest Service, comply with the Council's regulations by adopting supplemental procedures.

occurs when the proposed action falls within a categorical exclusion, *i.e.*, those actions predetermined not to "individually or cumulatively have a significant effect on the human environment." *Id.* § 1508.4. The Forest Service has created a list of 24 such categories.[2] *See* Forest Service Handbook 1909.15 (Environmental Policy and Procedures Handbook), Ch. 30, §§ 31.12, 31.2, http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?1909.15 (last visited March 24, 2006) [hereinafter Forest Service Handbook]. Examples include small acreage timber-thinning and harvesting, as well as the construction of trails, utility lines, and meteorological sampling sites. *See id.*

Federal law limits categorical exclusions in one critical respect: a proposed action is precluded from categorical exclusion if "extraordinary circumstances" exist such that "a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. Extraordinary circumstances may exist, for example, where a proposed action—albeit small in scope—significantly affects inventoried roadless areas, archaeological sites, flood plains, or federally listed threatened or endangered species habitat. Forest Service Handbook, Ch. 30, § 30.3.

2. *National Forest Management Act*

---

[2] This number excludes seven categories created by the Secretary of Agriculture which do not involve physical projects within the National Forest system but instead involve activities such as budget proposals, educational programs, and legal counseling. *See* Forest Service Handbook, Ch. 30, § 31.11.

Under the National Forest Management Act of 1976 ("NFMA"), the Forest Service must develop a land and resource management plan, commonly known as a forest plan, for each unit of the National Forest System. 16 U.S.C. § 1604(a), (e), (g)(3)(B). The Forest Service manages each forest unit at two different levels: (1) programmatic and (2) project. *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167–68 (10th Cir. 1999).

At the programmatic level, the Forest Service creates general, forest-wide planning goals memorialized in a forest plan. Because the Forest Service must account for a variety of different interests, each forest plan envisions the forest will be used for multiple purposes, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). At the same time, the forest plan provides for "diversity of plant and animal communities based on the suitability and capability of the specific land area." *Id.* § 1604(g)(3)(B).

At the project or site-specific level, the Forest Service implements the forest plan by approving or disapproving particular projects using an environmental impact statement, an environmental assessment, or a categorical exclusion. Projects must comply with the applicable forest plan. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006); *see* 16 U.S.C. § 1604(i).

## 3. Implementing Regulations

Before a forest plan may be created, NFMA "explicitly requires the Secretary of Agriculture to issue regulations that set out the process for the development and revision of land management plans for units of the National Forest System, and regulations that establish management planning standards and guidelines . . . ." 47 Fed. Reg. 43,026, 43,037 (Sept. 30, 1982). Of particular concern in this case are planning rules the Forest Service adopted in 1979 and revised in 1982, codified at 36 C.F.R. § 219 (1982), which govern Forest Service management at both the programmatic and project levels. *See generally id.* In November 2000, the Forest Service substantially amended these regulations, known as the 1982 planning rules, replacing them with the 2000 planning rules, codified at 36 C.F.R. § 219 (2001). 65 Fed. Reg. 67,568 (Nov. 9, 2000).

The 2000 planning rules were not immediately promulgated. Instead, the new regulations contained transition provisions which provided that, beginning on November 9, 2000, until the promulgation of the new, final rule, the Forest Service should consider "the best available science in implementing a forest plan."[3] 36 C.F.R. § 219.35(a), (d) (2001). These transition provisions remained

---

[3] A transition period for the 2000 regulations was created in order that the individual units of the Forest Service would have ample time "to incorporate regional guide direction into agency procedures or plan decisions," thereby "ensur[ing] consistency among national forests and grasslands." 65 Fed. Reg.

(continued...)

on the books until January 2005 when the new rules were finally implemented. 36 C.F.R. §§ 219.1 to .16 (2005); 70 Fed. Reg. 1,023 (Jan. 5, 2005). The 2005 rules retained the best available science standard, requiring the "Responsible Official [to] *take into account* the best available science" by "document[ing] how the best available science was taken into account in the planning process," and evaluating and disclosing substantial uncertainties and risks in that science. 36 C.F.R. § 219.11(a) (2005) (emphasis added).

*B. The Seven Mile Project*

The Seven Mile Spruce Beetle Management Project ("Seven Mile Project" or "Project") sitting within the 1,424,479 acres of the Fishlake National Forest in south-central Utah, is located approximately 22 miles east of Richfield, Utah. Because it sits within the Fishlake National Forest, the Seven Mile Project is governed by the Fishlake Forest Plan ("the Forest Plan" or "Plan"). *See* U.S. Dep't of Agric., Forest Service Region 4, Land and Resource Management Plan for the Fishlake National Forest, http://www.fs.fed.us/r4/dixie/projects/FParea/LiveDocs/Fishlake.pdf (last visited March 24, 2006) [hereinafter Forest Plan]. The Project involves a selective harvest of beetle-infested mature, dead, diseased, or dying Englemann spruce

---

[3](...continued)
67,514, 67,527 (Nov. 9, 2000).

timber stands covering approximately 123 acres. By implementing the Project, the Forest Service plans to prevent an epidemic infestation of spruce beetle from spreading into adjacent stands and killing the spruce. In so doing, the Forest Service hopes to protect mature stands, preserve wildlife habitat, and reduce the risk of wildfire.

The Forest Service ultimately approved the Seven Mile Project under categorical exclusion 14 ("Category 14") in 2004. However, consideration of this particular project had begun over five years earlier. Beginning in June 1999, the Seven Mile Project was approved under another timber harvest categorical exclusion known as Category 4. When a federal district court in Illinois invalidated Category 4 later that year, *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962 (S.D. Ill. 1999), the Forest Service opted to prepare an environmental assessment for the Seven Mile Project, which was completed in June 2000. The Regional Forester deemed this environmental assessment inadequate; consequently, another draft environmental assessment for the Project was prepared in September 2003. At the same time the Forest Service was completing this revised environmental assessment, a new set of categorical exclusions was adopted by the Department of Agriculture, which included Category 14.

Category 14 applies to small acreage timber-thinning projects.

Specifically, it excludes from NEPA review "commercial and noncommercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than 1/2 mile of temporary road construction, including removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease." Forest Service Handbook, Ch. 30, § 31.2(14).

Finding Category 14 would apply to the Seven Mile Project, the Fishlake National Forest district ranger issued a Decision Memorandum in May 2004. He concluded that "[Category 14] is appropriate in this situation because there are no extraordinary circumstances related to the proposed action." J.A. 535. The district ranger replaced the original Decision Memorandum in October 2004 with a new Memorandum, but left the project largely unmodified.[4]

In sum, the local forest officials found "that the spruce beetle infestation in the Seven Mile Project area has escalated substantially during the past 8 years . . . [and] at least 80 percent mortality will occur in non-infested spruce in the absence of thinning." *Id.* at 551. The district manager assured that (1) "three snags per acre will be retained . . . [as well as] snags containing nest cavities or offering potential nesting opportunities . . . to provide for [foraging and nesting] for three-

---

[4] The district ranger wrote, "This decision supercedes, and is essentially the same as my former decision with the exception that the 0.75 mile of road reconstruction will not be implemented as part of this decision." J.A. 549.

toed woodpeckers;" (2) although "no sensitive species are known to occur in the project area, and suitable habitat has not been found," local forest rangers "will continue to survey the project area for all sensitive species during pre- and post-treatment activities;" and (3) if any goshawk are discovered during the "ongoing surveys [] being conducted for the northern goshawk," the Forest Service will act appropriately "to conserve this species." *Id.* at 550.

*C. Decision Below*

Following the Forest Service's authorization of the Seven Mile Project, UEC filed suit in district court, alleging the Forest Service's authorization of the Seven Mile Project violated NEPA, NFMA, and the Administrative Procedures Act ("APA"). In April 2005, the district court found in favor of the Forest Service on all claims. The district court concluded that the Forest Service did not act arbitrarily in applying Category 14. Furthermore, the court found that the Forest Service adequately monitored the management indicator species in accordance with the Fishlake Forest Plan. In reaching these conclusions, the court held that the 1982 planning rules were not applicable to the Seven Mile Project and instead applied the 2000 planning rules.

## II. Standard of Review

Because neither NEPA nor NFMA provide a private right of action, this court reviews the Forest Service's approval of the Seven Mile Project as a final

agency action under the APA.  *Utah Envtl. Cong. v. Bosworth*, 372 F.3d 1219, 1223 n.3 (10th Cir. 2004) ("*UEC I*"); *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000).  We consider the district court's decision de novo.  *Am. Wildlands v. Browner*, 260 F.3d 1192, 1196 (10th Cir. 2001).  However, we will not overturn the agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

While administrative agencies generally are afforded a presumption of regularity, an agency's decision will nonetheless be arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Furthermore, we must determine whether the disputed decision was based on consideration of the relevant factors and whether there has been a clear error of judgment.  *Id.*  Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

In reviewing conflicting interpretations of an agency's statutes and

regulations, this court grants "substantial deference" to the agency's interpretation of its own regulations. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994). We may reject the agency's interpretation only when it is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 738 (10th Cir. 1993).

## III. Analysis

UEC appeals the district court's approval of the Seven Mile Project raising three primary allegations of error: (1) the Forest Service acted arbitrarily and capriciously by failing to consider the cumulative impact of the Seven Mile Project on fish and wildlife; (2) the district court improperly used the Forest Service's 2000 transition provisions, as opposed to the 1982 planning rules, to evaluate the Seven Mile Project; and (3) the Forest Service failed to collect adequate data for management indicator species in violation of the Fishlake National Forest Plan and NEPA. We discuss, and reject, each of UEC's contentions in the following sections.

*A. Categorical Exclusion of the Seven Mile Project*

We first address UEC's argument that the Forest Service acted arbitrarily and capriciously by authorizing the Seven Mile Project pursuant to Category 14's exclusion. UEC raises two separate claims: (1) the Seven Mile Project should not have been categorically excluded because use of an exclusion is appropriate *only*

when the Forest Service first conducts a preliminary analysis determining that the proposed project will have no significant or cumulative effects on the environment, and (2) the existence of extraordinary circumstances here precludes categorical exclusion of the Seven Mile Project.[5]

1. *Cumulative Impact*[6]

UEC's first claim is that "in order for an agency to determine whether a project may be categorically excluded, the agency must [definitively] determine, based on cumulative effects, whether categorical exclusion is appropriate." Aplt.'s Br. 27–28. Specifically, UEC asserts the Seven Mile Project should not have been categorically excluded because the Forest Service conducted an inadequate analysis of the Project's cumulative effects on the forest. UEC points

---

[5] UEC also argues that the environmental assessment completed in 2003 violated NEPA because the Forest Service never presented the draft environmental assessment to the public for comment nor properly finalized it through issuance of a "Finding of No Significant Impact." Aple.'s Br. 25–36. Both contentions are without merit since the Forest Service ultimately authorized the Seven Mile Project pursuant to Category 14. By its terms, environmental assessments are not required for categorically excluded projects *unless* extraordinary circumstances are found. The draft environmental assessment about which UEC complains was prepared *prior* to the Project's authorization under Category 14 and has no relevance here.

[6] "'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (2005). Cumulative impact is synonymous with cumulative effects. *Id.* § 1508.8(b).

to three specific omissions by the Forest Service, which it contends, demonstrate the failure to conduct an adequate cumulative impact analysis.  The Forest Service failed to (1) analyze the Project's effect on management indicator species;[7] (2) create an appropriate cumulative effects boundary encompassing the entire Project area and areas adjacent to the Project where the Project's effects could be perceived; and (3) analyze the Project's effect on sensitive species located outside the Project area but nonetheless still within the cumulative effects boundary as well as analyze the impact of other projects occurring within the cumulative effects boundary.  In addressing this argument, the Forest Service counters that UEC's argument would effectively render useless the purpose of categorical exclusions generally.  We agree.

> Federal regulations define the term "categorical exclusion" as:
>
> [A] category of actions which *do not individually or cumulatively have a significant effect on the human environment* and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations . . . .  Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4 (2003) (emphasis added).  By definition, then, a categorical

---

[7] Management indicator species "are a 'bellwether' for other species that have the same special habitat needs or population characteristics . . . ." *Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1190 (10th Cir. 2006) (internal citation and quotations omitted).  They "serve as a proxy for determining the effects of management activities on other species." *Id.* (internal citation and quotation omitted).

exclusion does not create a significant environmental effect; consequently, the cumulative effects analysis required by an environmental assessment need not be performed. That assessment has already been conducted as a part of the creation of the exclusion, which UEC does not challenge in this action.

Because the Seven Mile Project fell within the general confines of Category 14, a point that UEC also does not dispute, the Project was predetermined to have no significant effect. Under the regulation, only if extraordinary circumstances were present would the Forest Service need to perform further analysis in the form of an environmental assessment. *See Nat'l Trust for Historic Preservation v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987) (noting that "[b]y definition, [categorical exclusions] are categories of actions that have been predetermined not to involve significant environmental impacts, and therefore require no further agency analysis absent extraordinary circumstances").

We agree that it may be conceptually possible for a large number of small projects to collectively create conditions that could significantly effect the environment. But the regulation itself contains a provision to address that concern, namely the extraordinary circumstances exception. And the extraordinary circumstances safety-valve is more than capable of addressing specific harms allegedly created by specific projects, which we turn to next.

Accordingly, the Forest Service did not act arbitrarily in failing to conduct

any cumulative effects analysis unrelated to the existence of extraordinary circumstances.[8]

*2. Extraordinary Circumstances*

UEC next claims that even if the Forest Service was not required to do a preliminary cumulative effects analysis, the Forest Service nonetheless exhibited a clear error in judgment in failing to find extraordinary circumstances. To determine whether extraordinary circumstances exist, the Forest Service must consider if the proposed action may have a potentially significant impact on certain "resource conditions." Forest Service Handbook, Ch. 30, § 30.3, ¶ 2. The resource conditions are defined in the Forest Service Handbook as follows:

(a) Federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat, or proposed critical habitat, or Forest Service sensitive species.

(b) Floodplains, wetlands, or municipal watersheds.

(c) Congressionally designated areas such as wilderness, wilderness study areas, or national recreation areas.

(d) Inventoried roadless areas.

(e) Research natural areas.

---

[8] The district court reviewed this issue, finding that the Forest Service had performed extensive studies of both the Project itself and Category 14 generally. To the extent the district court's analysis addresses cumulative effects unrelated to the potential for extraordinary circumstances, this analysis was unnecessary. Because the Seven Mile Project met the general requirements for Category 14, no further agency action was required absent extraordinary circumstances.

(f) American Indians' and Alaska Natives' religious or cultural sites.

(g) Archaeological sites, or historic properties or areas.

*Id.*

Here, UEC claims subpart (a) is triggered because the Seven Mile Project will have "guaranteed effects" on the three-toed woodpecker and the northern goshawk. Aplt.'s Br. 38. Therefore, UEC argues, the Forest Service was required to perform an environmental assessment. In particular, UEC claims the Forest Service, while finding "no impact" on the northern goshawk, conceded in its Decision Memorandum that the Project "may affect" the three-toed woodpecker. In light of the Forest Service's uncertainty, UEC argues, it should invoke the extraordinary circumstances exception. The Forest Service, on the other hand, interprets the applicable regulations to require a significant environmental effect, not just any effect as asserted by UEC.

The regulatory language guides our analysis. In general, environmental regulations do not place a heavy burden on federal agencies to detail actions which will have only insignificant effects on the health of the environment. For example, "a detailed statement by the responsible official on the environmental impact of [a] proposed action" is required only for "Federal actions *significantly affecting* the quality of the human environment . . . ." 42 U.S.C. § 4332(C) (emphasis added); *see* 68 Fed. Reg. 44,598, 44,600 (July 29, 2003) (noting that

-17-

the Forest Service's "scarce resources" should be concentrated on "major Federal actions and not expend[ed] . . . analyzing agency actions where experience has demonstrated the *insignificance* of effects") (emphasis added).

The analysis is no different with regard to the Forest Service's use of categorical exclusions. As we already discussed, the presence of an extraordinary circumstance precludes the application of a categorical exclusion. And such a circumstance exists only where a proposed action "may have a *significant* environmental effect." 40 C.F.R. § 1508.4 (emphasis added); Forest Service Handbook, Ch. Zero Code, § 05; *see* 40 C.F.R. § 1508.4 (defining categorical exclusion as a category of actions that do not "individually or cumulatively have a *significant* effect on the human environment") (emphasis added).

This language plainly requires that an action first may produce a significant effect before a federal agency engage in further analysis. This is only logical given the substantial analytical and evidentiary burdens triggered when a project is ineligible for categorical exclusion. By relying on categorical exclusions, the Forest Service promotes efficiency in its NEPA review process while avoiding unnecessary analysis. *See Fund for Animals v. Babbitt*, 89 F.3d 128, 130 (2d Cir. 1996) (noting that "[t]he [Counsel on Environmental Quality] has authorized the use of categorical exclusions to promote efficiency in the NEPA review process").

UEC contends that despite this provision, an effect need not be significant,

but merely predicted by the Forest Service, to trigger extraordinary circumstances. Thus, even a de minimis effect on a threatened species would bar application of the exclusion. In support of this proposition, it cites two statements from the Forest Service Handbook. First, the Handbook notes that "[t]he mere presence of one or more [] resource conditions does not preclude use of a categorical exclusion; instead, [i]t is the *degree of the potential effect* of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." Forest Service Handbook, Ch. 30, § 30.3, ¶ 2 (emphasis added). Second, the Handbook requires the Forest Service to prepare an environmental assessment if, based on its evaluation, "it is *uncertain* whether the proposed action may have a significant effect on the environment." *Id.* ¶ 3 (emphasis added); *see* 40 C.F.R. § 1508.27 (noting that the term "significantly" as used in NEPA requires consideration of both context and intensity; one intensity factor considered is "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.").

While it is true that the Handbook refers to the "degree of the potential effect of a proposed action on a resource condition," the regulation itself requires the potential for a "significant environmental effect." We must interpret the language found in the Handbook in light of the entire regulation and its

-19-

accompanying policy. *See United States v. Shewmaker*, 936 F.2d 1124, 1127 (10th Cir. 1991) (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956)) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."). We must also be careful not to disrupt the plain language of the regulation itself. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal quotation marks omitted). Considering the purpose of categorical exclusions in light of these factors and affording the agency's interpretation substantial deference, we conclude that an extraordinary circumstance is found only when there exists a potential for a *significant* effect on a resource condition. *See Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002) ("When reviewing an agency's interpretation and application of its categorical exclusions under the arbitrary and capricious standard, courts are deferential.").

In this light, we review UEC's contention that the Forest Service erred in evaluating whether the Seven Mile Project would significantly affect the three-toed woodpecker and the northern goshawk. The Forest Service found that although the Seven Mile Project will have "no impact" on the northern goshawk,

it "may affect, but is not likely to result in a trend toward federal listing or loss of viability for the three-toed woodpecker." J.A. 535.

Although UEC argues the Forest Service expressed "uncertainty" with regard to the two species, the Forest Service decision can hardly be construed to express such doubt. In evaluating the Seven Mile Project's effect on the northern goshawk, the Forest Service relied on helicopter and ground surveys documenting and confirming the lack of goshawk habitat in the proposed area. *Id.* at 511, 516. Explaining the lack of effect on the three-toed woodpecker, the Forest Service stated that while "it may impact individuals, individual territories, and cause displacement within the project area," the Project "would not contribute to a trend towards federal listing or a loss of population viability," *id.* at 516, since adequate woodpecker habitat would be preserved throughout the forest, and the Project would provide some long-term habitat improvements where intermediate harvesting or under-burning occurred. *Id.* at 512, 516.

These conclusions were based on a review of the species and habitat conducted as a part of the analysis leading to the agency's Decision Memorandum, including a biological evaluation of both species. *Id.* at 509–16. Additionally, the species monitoring performed by the Forest Service, although not consistently conducted on an annual basis, was more than ample to determine whether extraordinary circumstances existed. *See id.* at 298–300 (helicopter

surveys of goshawk nests for years 1998–2000); *id.* at 289–97 (surveys for

goshawk for years 1999, 2000, 2002, and 2003); *id.* at 301–05 (surveys for three-

toed woodpeckers for years 1998, 2000, 2002); *id.* at 386–452 (survey for three-

toed woodpeckers for year 2000).[9]

In sum, although the Forest Service found some possible effects, none were

potentially significant. As the Handbook clearly states, "[t]he mere presence of

one or more of these resource conditions does not preclude use of a categorical

exclusion." Because we afford the Forest Service substantial deference in

interpreting its own regulations and because the agency exhibited no clear error of

judgment in its factual determinations, we find that the Forest Service has not

acted arbitrarily in concluding the Seven Mile Project did not trigger a finding of

extraordinary circumstances.

Accordingly, the Forest Service did not violate the APA when it

categorically excluded the Seven Mile Project.

B. *1982 and 2000 NFMA Regulations*

---

[9] We note that additional evidence may have been available to the district court regarding effects to these species. UEC, however, provided us with a joint appendix that excerpted only portions of the administrative record. Because many of UEC's cites in its brief were to other portions of the administrative record, we could not verify them and were limited to the record before us. *See* 10th Cir. R. 10(b)(2) (2006) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion.").

We next address UEC's contention that the district court should have applied the 1982 planning rules, instead of the 2000 transition provisions, when reviewing the Forest Service's compliance with the regulations' species monitoring requirements. UEC argues two points: (1) the 2000 transition provisions were not effective at the time of the Project's implementation; and (2) even if the transition provisions were in effect, the Fishlake Forest Plan incorporates the 1982 regulations for purposes of projects considered in the Fishlake National Forest. The Forest Service disputes both arguments, contending the 2000 transition provisions were effective for purposes of the Project and that the Forest Plan's species monitoring program is independent of the 1982 rules.

Deciding whether the 1982 regulations apply to the Project, either of their own accord or by virtue of the Forest Plan, is important because the 1982 regulations and the 2000 transition provisions contain key differences governing species monitoring. The 1982 rules, for example, require the Forest Service to monitor the "[p]opulation trends of the management indicator species" and determine "relationships to habitat changes." 36 C.F.R. § 219.19(a)(6). And we have held that these obligations apply to "project level as well as plan level management actions." *UEC I*, 372 F.3d at 1225. Conversely, the 2000 transition provisions contain no such explicit language governing monitoring but merely

require "the responsible official [to] consider the best available science in implementing" a forest plan. 36 C.F.R. § 219.35(a), (d) (2001); 65 Fed. Reg. 67,514, 67,579 (Nov. 9, 2000). *See generally Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1190 (10th Cir. 2006) ("*UEC II*") (quoting *Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 117 (2d Cir. 2005), for the proposition that "the standards of the 1982 Rules and the 2000 Transitional Rule are–at least–distinct . . . .").

*1. Implementation of the 2000 Transition Provisions*

We begin with UEC's first argument: the 2000 transition provisions, although implemented in November 2000, are nonetheless inapplicable to the Seven Mile Project.

To be sure, courts have expressed considerable confusion in applying the 2000 transition provisions. *See* 69 Fed. Reg. 58,055, 58,055 (Sept. 29, 2004). They have reached varying conclusions regarding the applicability of the provisions to projects approved during the transition period. *See, e.g.*, *UEC II*, 439 F.3d at 1189–90, 1195 (applying the 1982 rules because the Forest Service conceded their applicability; the court noted it did not resolve the question of the 2000 transition provisions' applicability); *Forest Watch*, 410 F.3d at 118 (holding that the "plain language of the 2000 Transitional Rule" requires that "projects 'implemented' during the transition period must comply with the best available

-24-

science standard"); *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 800 n.3 (9th Cir. 2005) (holding that the applicable NFMA planning regulations are those in effect at the time "the plan revisions challenged in this lawsuit were prepared"); *Defenders of Wildlife v. Johanns*, No. 04-4512, 2005 WL 2620564, at *7 (N.D. Cal. Oct. 14, 2005) (unpublished opinion) (applying *Natural Resources* to conclude that the "2004 Interpretative Rule may continue to be applied in cases where the challenged action was taken during the 2004 Interpretative Rule's effective period"); *Clinch Coal. v. Damon*, 316 F. Supp. 2d 364, 381 (W.D. Va. 2004) (suggesting the 1982 planning rule would apply to a 2001 decision); *Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687, 707 (S.D. Ill. 2004) (noting that "[o]n November 9, 2000, the Department of Agriculture made wholesale changes to the relevant regulations, making prior citations obsolete").

In an attempt to address this confusion, the Forest Service issued an interpretative rule on September 29, 2004. Introducing the rule, the Forest Service explained:

> [I]t is clear that site-specific decisions entered into during the transition period are not to comply with the substantive provisions of the 2000 planning rule. This interpretative rule clarifies that until a new final rule is promulgated, the transition provisions of the 2000 planning rule, as amended by the May 2002 interim final rule remain in effect . . . .

69 Fed. Reg. 58,055, 58,056 (Sept. 29, 2004). The interpretative provision emphasized that "responsible officials consider the best available science in

implementing national forest land management plans and, as appropriate, plan

amendments." *Id.*

> As to the continuing vitality of the 1982 provisions:
>
> [T]he 1982 planning rule may continue to be used only for plan amendments and revisions upon election of the responsible official. Appropriate plan amendments and projects proposed during the transition period should be developed considering the best available science in accordance with § 219.35 paragraph (a).[10]

*Id.* As we explained in *UEC II*, "the 2000 regulations rendered the 1982 rule

inoperative for project-specific decisions made after November 9, 2000. The

---

[10] The relevant language governing the transition is found in 36 C.F.R. § 219.35(a)–(d) (2001):

(a) The transition period begins on November 9, 2000 and ends upon the completion of the revision process (§ 219.9) for each unit of the National Forest System. During the transition period, the responsible official must consider the best available science in implementing and, if appropriate, amending the current plan.

(b) If, as of November 9, 2000, a plan revision or amendment has been initiated under the 1982 planning regulations in effect prior to November 9, 2000 (See 36 CFR part 219, revised as of July 1, 2000.) and if a notice of availability of a draft environmental impact statement or an environmental assessment is published by May 9, 2001 in the Federal Register, the responsible official may complete the amendment or revision process under the 1982 regulations or adjust the process to conform to the provisions of this subpart.

(c) If a review of lands not suited for timber production is required before the completion of the revision process, the review must take place as described by the provisions of § 219.28, except as provided in paragraph (b) of this section.

(d) Site-specific decisions made by the responsible official 3 years from November 9, 2000 and afterward must be in conformance with the provisions of this subpart.

-26-

interpretative rule stated that, during the transition period between November 2000 and promulgation of a final rule, the Forest Service should use the 'best available science' under § 219.35(a) for project decisions." *UEC II*, 439 F.3d at 1189.

We afford an agency's interpretation of its own regulations "substantial deference," *Olenhouse*, 42 F.3d at 1576, except in those instances where such interpretation is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." *Bar MK Ranches*, 994 F.2d at 738. We recognize, of course, that although interpretative rules can inform our decision, they do not have the force and effect of law in the adjudicatory process. *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995).

In conducting our analysis, then, we are guided primarily by the plain meaning of the 2000 transition provisions as well as the Forest Service's interpretative rule.[11] However, before looking at this language, it is important to

---

[11] In its brief, UEC directed us to our opinion in *UEC II* for the proposition that the 1982 rules are applicable. However, the *UEC II* panel recently granted a limited rehearing to modify the original opinion. This modified opinion removed nearly all reference to its earlier rationale for finding the 1982 rules' applicability. Significantly, the *UEC II* court continued to find the 1982 rules applicable, but solely due to the Forest Service's concession that it elected to apply the 1982 rules. *See UEC II*, 439 F.3d at 1189 (stating that "[s]ignificantly, and thankfully, the Forest Service now concedes on appeal that it has waived any argument that the 2000 regulations apply"). The panel concluded its opinion, stating "[w]e do not address whether the agency should apply the 1982 rule or the 2005 rule's transition provision during further proceedings." *Id.* at 1195.

distinguish the terms used to define a forest plan generally from those used to define specific projects implemented under a forest plan. This distinction is crucial because the 2000 transition provisions endorse different standards for forest plans generally and individual projects in particular. Thus, when the Forest Service employs the term "plan," as in "plan amendments and revisions," "plan" refers to forest plans generally. On the other hand, when the Forest Service uses the term "project" or "implementing the plan," the term refers to individual projects.

With this distinction in mind, we turn to the text. The transition provisions mandate that "[d]uring the transition period, the responsible official *must* consider the best available science in *implementing* . . . the current plan." 36 C.F.R. § 219.35(a) (emphasis added); *cf.* § 219.35(b) ("If, as of November 9, 2000, a plan revision or amendment has been initiated under the 1982 planning regulations . . . the responsible official *may* complete the amendment or revision process under the 1982 regulations") (emphasis added). This language is the sole direction to the Forest Service regarding project-level actions. Nonetheless, it leaves little doubt that the Forest Service is limited to consideration of the best available science when approving a project during the transition period. The interpretative rule confirms this interpretation, stating in no uncertain terms that "projects *proposed* during the transition period should be developed considering

-28-

the best available science." 69 Fed. Reg. 58,055, 58,056 (Sept. 29, 2004) (emphasis added). While it is true that interpretative rules are not legally binding on this court, an agency's interpretation should be given substantial deference unless the interpretation is plainly erroneous. Here, the interpretative rule clearly concludes the 1982 rules are no longer applicable for projects proposed during the transition period. Thus, any projects proposed during the transition period must conform with the best available science standard set forth in the 2000 transition provisions.

While there may be many different interpretations for the term "proposed," under any definition we would conclude that the Seven Mile Project was proposed during the transition period. The district ranger gave his final approval to the Project in October 2004, well within the transition period. But even if we looked to the time the Forest Service issued its first Decision Memorandum, that takes us back only to May 2004. To be sure, initial evaluation of the Project began in 1999. But this initial evaluation is irrelevant to the ultimate discretion exercised by the Forest Service. The Forest Service's previous two attempts to create the Seven Mile Project, first by categorical exclusion and later by environmental assessment, both unequivocally rejected by the Regional Forester, do not bear on the 2004 decision. Category 14 was not created until 2003. The Forest Service did not begin a proposal under Category 14 until April 2004. Because the agency

action arose from a categorical exclusion not developed until 2003 and because the transition provisions were clearly in place at that time, the 1982 rules are not applicable.

As a final matter, the interpretative rule would have constrained the Forest Service's conduct in this instance. The interpretative rule was issued on September 29, 2004. The final authorization of the Seven Mile Project occurred in October 2004. As the interpretative rule clarifies, "[T]he provisions of the 1982 planning rule may continue to be used *only* for *plan amendments and revisions* upon election of the responsible official. Appropriate plan amendments and *projects proposed during the transition period should* be developed considering the best available science . . . ." 69 Fed. Reg. 58,055, 58,056 (Sept. 29, 2004) (emphasis added); *see* 70 Fed. Reg. 1023, 1024 (Jan. 5, 2005) (noting that the 2002 interim rule allowed "Forest Service managers to elect to continue preparing *plan amendments and revisions* under the 1982 planning rule") (emphasis added). While our court may not be bound by the interpretative rule, certainly the agency itself is. In this respect, then, beginning on September 29, 2004, the date the interpretative rule was issued, the Forest Service was obligated to consider the best available science, and not the 1982 rules, in its implementation of the Seven Mile Project. In other words, the section of the 1982 rules which imposed an obligation on the Forest Service to monitor management

indicator species over the life of a project, *see UEC I*, 372 F.3d at 1225, simply could not have any effect as to those project-level actions taken after the interpretative rule was issued.

### 2. *Effect of the Fishlake Forest Plan*

Finally, UEC argues that the Fishlake Forest Plan incorporated the 1982 regulations as its governing provision, as evidenced by the Forest Plan's detailed species monitoring requirements. The 1982 regulations, UEC argues, must therefore be followed even if they have been subsequently repealed or modified. We disagree.

No party disputes that the Forest Plan envisions a species monitoring program for the Fishlake National Forest. It identifies, for example, several management indicator species and states in its "Implementation" chapter that the Forest Service will use "Population Trends" for management indicator species monitoring. However, the Forest Plan does not explicitly require that the Forest Service comply with the monitoring requirements of the 1982 rules. Nor can such an obligation be reasonably implied. According to the Fishlake Forest Plan, it was "developed under implementing regulations of . . . Title 36, Code of Federal Regulations, Part 219 . . . ." Record of Decision for Fishlake National Forest Plan, at 1. Yet, an extensive search of the Forest Plan reveals that it does not explicitly reference or adopt § 219.19 of the 1982 rules, concerning the selection

and monitoring of management indicator species.[12] Therefore, we cannot read the Forest Plan to adopt the 1982 rules.

That is not to say, however, that the Forest Plan does not include some requirements related to monitoring. It does. And the Forest Service must comply with the Fishlake Forest Plan during the transition period. *See* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 730 (1998) (opining that before the Forest Service can begin a project, it must "ensure that the project is consistent with the [applicable] Plan"); *see also* 36 C.F.R. § 219.14(f) (2005) ("For units with plans . . . in effect prior to November 9, 2000, the Responsible Official may comply with any obligations relating to management indicator species by considering data and analysis relating to habitat unless the plan specifically requires population monitoring or population surveys for the species."); 69 Fed. Reg. 58,055, 58,056 (Sept. 29, 2004) (requiring "[p]rojects implementing land management plans [to] be consistent with the provisions of the governing plan"). But, it is only those requirements that arise solely from the

_____

[12] The Fishlake Forest Plan also recognizes that Forest Service regulations may change. While the Plan generally remains constant, the regulations are fluid. "During *implementation* of this Forest Plan, the Fishlake will be guided by existing and *future* laws, regulations, policies, and guidelines. The Forest Plan is designed to supplement, not replace, direction from these sources." Forest Plan, at V-1 (emphasis added).

Forest Plan, not from the 1982 rules, to which the Forest Service must adhere.

In sum, the 1982 planning rules are not applicable to the Seven Mile Project. Instead, the Project is subject to the transition provisions of the 2000 planning rules as interpreted by the Forest Service. Accordingly, in implementing a project under the Forest Plan, the Forest Service "must consider the best available science." 36 C.F.R. § 219.35(a) (2001).[13] Since UEC does not argue that the Forest Service failed to consider the best available science when it implemented the Seven Mile Project, we find no error in the district court's order affirming the agency's decision.

## C. The Fishlake Forest Plan Monitoring Program

Finally, we address UEC's challenge alleging the Forest Service failed to comply with the Fishlake Forest Plan because it neither conducted annual population trend surveys nor collected adequate population trend data for multiple management indicator species. In essence, UEC argues that the Forest Plan requires the collection of annual population trend data as a condition precedent to the approval of the Seven Mile Project.

---

[13] Although UEC points to *UEC II* for the proposition that the 1982 rules apply, there is a principled distinction between the two cases: the instant appellees never conceded, either in its briefs or during oral argument, that the 1982 rules apply. *See UEC II*, 439 F.3d at 1189. Nor may *UEC I* offer support since the question of the 1982 rules' applicability was never raised before that court. *See UEC I*, 372 F.3d at 1221 n.1 (finding the 1982 regulations applied since they were "[t]he regulations in effect at the time of the disputed Forest Service decisions in this case").

Although conceding that individual projects must be consistent with the applicable forest plan, the Forest Service contends it was not required to monitor management indicator species as a condition precedent to approval of the Project. It justifies this assertion with two separate arguments: (1) a court may only review a claim of inadequate species monitoring under a forest plan if some relationship exists between the required monitoring and the challenged project; and (2) the Fishlake Forest Plan does not require data collection at the project-level. In any event, the Forest Service argues, the compiled population trend data satisfied the monitoring obligations under the Plan.

We agree with the Forest Service that monitoring of management indicator species was not a condition precedent to approval of the Seven Mile Project. In so holding, we conclude that the Fishlake Forest Plan does not require the application of its monitoring requirements to a categorically excluded project, and in any case, the Forest Service conducted MIS monitoring as set forth in the Plan.

### 1.  Application of a Forest Plan's Monitoring Requirements to a Categorically Excluded Project

As we have already noted, our jurisdiction in this case arises under the APA, since neither NEPA nor NFMA provide UEC a private cause of action. Under the APA, a case may only be ripe for review if the federal conduct at question constitutes a final agency action.  5 U.S.C. § 704; *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000).

-34-

Ordinarily, a forest plan's forest-wide monitoring program is not subject to judicial review because it does not constitute final agency action. *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 925–26 (9th Cir. 1999); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (holding that Bureau of Land Management's failure to implement an off-road vehicle monitoring program was not a final agency action). In limited circumstances, however, we may review a monitoring program to the extent it bears on the approval of a particular project. *See Ecology Ctr.*, 192 F.3d at 926 n.6 (concluding that plaintiff may "raise claims pertaining to inadequate monitoring by bringing an APA challenge to a final decision"); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) ("Of course, not all forest-wide practices may be challenged on the coattails of a site-specific action; there must be a relationship between the lawfulness of the site-specific action and the practice challenged."). In other words, if a project's approval is conditioned upon the fulfillment of certain monitoring obligations, a plaintiff may bring a claim of deficient monitoring. Without such a relationship, a claim of deficient monitoring simply is not cognizable.

UEC has not shown a connection between the monitoring program and the Seven Mile Project. More fundamentally, no showing has been made that the applicable Forest Service regulations and directives conditioned approval of the

-35-

Seven Mile Project, a project proposed pursuant to a categorical exclusion, on the successful monitoring of management indicator species at either a forest-wide or project level.

A categorical exclusion, by definition, only covers projects that will have no significant or cumulative effect on the environment. As such, relatively little analysis is required of the Forest Service once it determines that a project fits within the four corners of a categorical exclusion. This is because the Forest Service previously did the heavy lifting when it created the categorical exclusion—it conducted an extensive environmental analysis and determined that any project approved under a categorical exclusion would not produce a significant or cumulative effect on the environment in the absence of extraordinary circumstances. *See, e.g.*, *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1210 (10th Cir. 2006) (explaining that the Forest Service performed "on-site, post-implementation assessments of [the sample] projects' environmental effects" in order to determine whether the proposed categorical exclusion would create a significant effect on the environment). Thus, to require monitoring, documentation, and review of population trend data for species which do not trigger an extraordinary circumstance would defeat the very purpose of the categorical exclusion.

To be sure, the Fishlake Forest Plan in describing the monitoring

requirements for management indicator species does not explicitly exempt categorically excluded projects from such monitoring. However, monitoring is required only where such data is relevant. And pre-implementation monitoring of management indicator species is relevant only where population trend data is necessary to evaluate a proposed project's actual effect on the environment—such as where (1) a proposed project will create a significant impact on the environment, thus requiring an environmental impact statement, or (2) a proposed project's impact is uncertain, thus requiring an environmental assessment. *See* Forest Plan, at V-2 (noting that the monitoring program assists in determining "whether the effects of implementation are as predicted").

In contrast, monitoring is merely cumulative in the case of a categorical exclusion because the Forest Service has already performed an extensive environmental analysis of representative projects that fall within the exclusion. *See Colo. Wild*, 435 F.3d at 1210–11 (describing the Forest Service's development of Category 14). The only exceptions are those projects where extraordinary circumstances may be present. Thus, small projects amenable to a categorical exclusion—small construction projects and low acreage forest treatment— require monitoring of those species which may trigger an extraordinary circumstance.

It finally should be noted the Fishlake Forest Plan itself provides that it is

designed to "supplement, not replace, direction" from "existing and future laws, regulations, policies, and guidelines." *Id.* at V-1. Such is the case here: the Seven Mile Project was pre-determined to produce no significant effects on the environment and otherwise determined not to involve any extraordinary circumstances, therefore being approved pursuant to a categorical exclusion.

In sum, approval of a project under a categorical exclusion is not only meant to be analytically simple, but easy to implement. Consequently, neither Forest Service regulations nor the Forest Plan requires monitoring of management indicator species as a condition precedent to the approval of a categorically excluded project.[14] Accordingly, the Forest Service had no obligation to conform with the monitoring program set forth in the Fishlake Forest Plan before it approved the Seven Mile Project.

*2. Population Trend Data*

In any event, we hold that the Forest Service collected adequate population trend data to conclude that the Seven Mile Project could be approved pursuant to a categorical exclusion. The Forest Plan requires annual population trend monitoring of management indicator species including, "Bonneville Cutthroat Trout, threatened plant species, nongame species, and macroinvertebrates."

---

[14] We are careful to distinguish analysis of those species which trigger application of extraordinary circumstances under a categorical exclusion—an issue we squarely addressed and resolved in *supra* Part III.A.2.

Forest Plan, at Table V-1. UEC alleges that the Forest Service has not complied with this provision in several respects, resulting in inadequate data by which to measure the Project's effect on fish and bird species.

### a) Aquatic Management Indicator Species

First, UEC argues the Forest Service failed to collect population trend data for Bonneville Cutthroat Trout, macroinvertebrates, and resident trout (including brown, brook, cutthroat, rainbow, and lake trout). We disagree.

Forest-wide trends for these species have been documented. *See* J.A 504 (Bonneville Cutthroat Trout); *id.* at 505 (resident trout); *id.* at 506 (macroinvertebrates); *see also* Fishlake National Forest Plan Monitoring and Evaluation Report (Dec. 2003) (population trend data covering 1977–2002). Project-level data, however, were not collected because no fish-bearing streams and lakes exist within the cumulative effects area. *See* J.A. 510 ("No streams, lakes, or ponds present within the proposed project area.").

### b) Avian Management Indicator Species

UEC also asserts that the Forest Service failed to collect annual population trend data for various avian species, in particular the hairy woodpecker, western bluebird, Lincoln's sparrow, song sparrow, Brewer's sparrow, yellow warbler, and vesper sparrow. Again, we disagree.

Population trend data for each of these management indicator species,

-39-

sufficient to satisfy the Forest Service's monitoring obligations under the Plan, have been detailed in the *Life History and Analysis of Endangered, Threatened, Candidate, Sensitive, and Management Indicator Species of the Fishlake National Forest* (2004) ("*Life History Report*") as well as other documentation related to the Project. While we recognize that the Forest Service did not collect annual population trend data in every instance, its data was nonetheless ample to support the district ranger's decision to approve the Seven Mile Project pursuant to a categorical exclusion.

*Hairy Woodpecker*. Forest-wide population trend data is available for the hairy woodpecker from 1968 to 1998, 2001, and 2002, showing a stable population which is "likely viable" across the Forest. *See* J.A. 157–61 (*Life History Report*); *id.* at 203–08 (Cavity Nesting Study); *id.* at 528–29 (Environmental Assessment). Project-level data from 2001 is available. *See id.* at 205–07 (Cavity Nesting Study).

*Western Bluebird*. Forest-wide data shows an upward trend in the western bluebird population, based on data collected from 1968 to 1998, 2001, and 2002. *See id.* at 161–66 (*Life History Report*); *id.* at 203–08 (Cavity Nesting Study); *id.* at 528–29 (Environmental Assessment). Project-level data from 2001 is available. *See id*. at 205–07 (Cavity Nesting Study).

*Lincoln's Sparrow*. Forest-wide data shows an upward trend in the

Lincoln's sparrow population, based on data collected from 1968 to 1998, 2001, and 2002. *See id.* at 161–66 (*Life History Report*); *id.* at 531 (Environmental Assessment); *id.* at 250–87 (Riparian Bird Survey). Additionally, district-level data from 2002 is available. *See id.* at 251–54, 260, 267–69, 275 (Riparian Bird Survey). However, project-level data for this species has not been collected because, although the Lincoln's sparrow may use the Seven Mile Valley area for breeding or nesting habitat during the spring and summer, it would not use the Project area itself. *Id.* at 531.

*Song Sparrow*. Forest-wide data shows a slightly upward trend in the song sparrow population based on data collected from 1968 to 1998, and 2002. *See id.* at 177–81 (*Life History Report*); *id.* at 531 (Environmental Assessment); *id.* at 250–87 (Riparian Bird Survey). Additionally, district-level data from 2002 is available. *See id.* at 251–54, 260, 267–69, 275 (Riparian Bird Survey). However, like the Lincoln's sparrow, project-level data is not available because the song sparrow would not use the Project area for breeding and nesting. *Id.* at 531.

*Yellow Warbler*. Forest-wide data shows a stable, to slightly upward trend in the yellow warbler population, based on data collected from 1968 to 1998, and 2002. *See id.* at 182–86 (*Life History Report*); *id.* at 531 (Environmental Assessment); *id.* at 250-87 (Riparian Bird Survey). District-level data from 2002 is also available. *See id.* at 251–54, 260, 267–69, 275 (Riparian Bird Survey).

However, like both the Lincoln's sparrow and the song sparrow, no project-level data is available because the yellow warbler does not use the Project area for breeding and nesting. *Id.* at 531.

*Brewer's Sparrow*. Forest-wide data shows an upward trend in the Brewer's sparrow population, based on data collected from 1968 to 1998, and 2002. *See id.* at 187–92 (*Life History Report*). However, no suitable nesting or breeding habitat is found within the Project area, and consequently no project-level data is available. *Id.* at 530 (Environmental Assessment).

*Vesper Sparrow*. Finally, forest-wide data shows a stable or slightly upward trend in the vesper sparrow population, based on data collected from 1968 to 1998, and 2002. *See id.* at 193–97 (*Life History Report*). However, no suitable nesting or breeding habitat is found within the Project area, and consequently no project-level data is available. *Id.* at 530 (Environmental Assessment).

\*     \*     \*

Accordingly, since the Forest Plan's monitoring obligations are inapplicable to projects subject to categorical exclusions such as the Seven Mile Project, and because, even if applicable, the Forest Service collected adequate population trend data for approval of a categorically excluded project, UEC has failed to demonstrate the Forest Service's approval of the Seven Mile Project is arbitrary and capricious.

## IV. Conclusion

We AFFIRM the district court's order finding the Seven Mile Spruce Beetle Management Project in compliance with the Administrative Procedures Act, the National Environmental Policy Act, and the National Forest Management Act.